813 A.2d 342

**Akil Jabari ROEBUCK**

v.

**STATE of Maryland.**

No. 01799, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Dec. 23, 2002.

Nicole M. Zell, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Joseph I. Cassily, State's Atty. for Harford County, Bel Air, on the brief) for appellee.

Argued before HOLLANDER, SALMON, PAUL E. ALPERT (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

This case has its roots in the brutal murder of fourteen-year-old Jacoby ("Coaster") Fagan. A jury sitting in the Circuit Court for Harford County convicted Akil Jabari Roebuck, appellant, of the first degree murder of Fagan, as well as the use of a handgun in the commission of a felony or crime of violence. Upon conviction, the court sentenced appellant to life imprisonment as to the murder charge, and imposed a consecutive five-year sentence for the handgun offense.

On appeal, we have been asked to decide whether the circuit court erred in barring appellant from introducing into evidence a statement made by appellant's cousin, Rolston James, Jr., a co-defendant who was tried separately for Fagan's murder. Appellant claimed that James's statement, which was incriminating as to James and arguably exculpatory as to appellant, constituted a declaration against penal interest. Although the State had already relied on James's statement at James's murder trial, it objected to appellant's use of the statement. Finding the statement unreliable, the trial court sustained the State's objection.

Roebuck presents three questions to the Court, which we have reordered and reworded:

I. Under Maryland Rule 5–804(b)(3), did the trial court err in barring defense counsel from introducing a declaration against penal interest that was made by an unavailable co-defendant, which was exculpatory as to appellant?

II. Did the trial court err in admitting into evidence enlarged color autopsy photographs depicting the victim's injuries?

III. Notwithstanding appellant's consent and waiver of any conflict, did the trial court err in allowing an attorney to represent appellant when that same lawyer previously represented an alleged accomplice in the murder, who testified for the State in exchange for a *nol pros* of the charges against him.

For the reasons that follow, we answer "yes" to Question I. Therefore, we shall vacate the judgment of conviction and remand for further proceedings. For the benefit of the parties and the court on remand, we shall also address Question II. Despite the interesting issue raised by appellant in Question III, we decline to address it, because it surely will not resurface on remand.

## FACTUAL SUMMARY

Fagan was savagely murdered on January 27, 2000. Early that morning, a group of young men spotted Fagan on Magno-

lia Road in Harford County, with blood in the snow around him. The victim was transported to Shock Trauma, where he died from massive injuries that included thirty-one stab wounds, eighteen cutting wounds, and three gunshot wounds to the head.

John Miller, Jr., Rolston James, Jr. ("Bible"), and appellant were charged with Fagan's murder. All three were friends, and James and appellant are also cousins. At the time of the murder, appellant was nineteen years old. In exchange for Miller's cooperation, the State subsequently *nol prossed* the charges against him. James was tried separately; by the time of appellant's trial, he had been convicted of Fagan's murder.

Following appellant's arrest on February 7, 2000, Roebuck gave a recorded statement to Sergeant Jason Merson of the Maryland State Police. In the statement, Roebuck said that he entered the woods with James and the victim, while Miller remained behind in the car. According to Roebuck, James cut Fagan's throat and stabbed him repeatedly. Although Roebuck admitted that he handed the gun to James at James's request, appellant claimed that James was the one who shot the victim.[1]

On February 8, 2000, Sergeant Merson also took a custodial statement from James. According to James, on the night of Fagan's murder, appellant, Fagan, and Miller were all at his house when "sparks start[ed]" between Fagan and James. Fagan got up and sat by his coat, which "concerned" James because James knew that Fagan had a gun in his coat. James recounted: "I went over in his face and got close and [said] do not sit beside your coat in my house disrespecting me like that when I know what you got in your coat." James claimed that he (i.e., James) was "high and drunk" at the time. To clear his mind, James suggested that the four "go out" to "have fun," and so the group left to see some girls. James recalled

---

1. For strategic reasons, appellant elected not to pursue his motion to suppress his statement.

that, at some point, he "just snapped, just snapped and got real tired of it."

According to James, he told Miller to stop the car near a wooded area. Then, James and the victim exited the vehicle. James also stated: "I was there, I could see myself doing it but I was begging myself to stop. I was begging literally begging myself to stop."

The following colloquy during James's interrogation is also relevant:

[MERSON]: Okay and then what happened[?]

[JAMES]: The only thing I can tell you is I remember Akil [Roebuck] tapping me on my shoulder and hitting me and beating me and telling me to stop.

[MERSON]: Akil, Akil was?

[JAMES]: Begging me to stop.

[MERSON]: Did you have a knife?

[JAMES]: Uh, huh.

[MERSON]: Was it your knife?

[JAMES]: Uh, huh.

\* \* \*

[MERSON]: Okay. Alright, um, so the next thing you remember is Akil tapping you on the shoulder and trying to get you to stop?

[JAMES]: Actually he wasn't tapping me. He was physically telling me to stop.

[MERSON]: Okay were you stabbing Coaster at that time?

[JAMES]: I can't really tell you.

[MERSON]: Who had a gun? . . . . Did you take the gun away from Coaster?

[JAMES]: Uh, huh.

[MERSON]: . . . [U]m, but you don't know if you kept the gun or [appellant] had the gun?

[JAMES]: All I can really tell you I wish I could tell you more but all I can tell you is that I wasn't there . . .

mentally.... To me it's, to me it don't really happen[.][I]t's still like a blur.

\* \* \*

[MERSON]: Did Akil stab Coaster? Are you saying you don't know?

[JAMES]: Like I told you, I, I really can't tell you from the point where he was....

\* \* \*

[MERSON]: Okay do you remember having the gun? Do you remember shooting Coaster? Either you did it, Akiel [sic] did it, or John [Miller] did it?

[JAMES]: [Inaudible] don't know what happened.

\* \* \*

[JAMES]: I know what I did. Like I told you I could have seen myself but it was just like me begging myself to stop and just by me just blocking out and just saying please stop.

[MERSON]: Did you see yourself from the outside what was going on? Did, from what you saw from the outside did [Akil] or [Miller] have any part in the killing of [the victim]? You have to speak up.

[JAMES]: No.

[MERSON]: Okay. It was just yourself that you saw?

[JAMES]: Basically.

By the time of appellant's trial in August 2001, James had already been convicted of Fagan's murder, and James's case was pending on appeal. As a result, by letter dated August 13, 2001, James's attorney advised appellant's counsel that, "if called to testify, [James] will invoke his Fifth Amendment privilege," because James's conviction was pending on appeal. Therefore, it is undisputed that James was not available as a witness at appellant's trial.

As anticipated, Miller testified for the State at appellant's trial. He recounted that he was with Fagan and appellant at James's home on the evening of January 26, 2000, drinking and smoking marijuana. Later that evening, they left in a car to "see girls." Miller, who was the driver, recalled that James

and Fagan disagreed about who was going to sit in the front seat, but Fagan prevailed. According to Miller, as he was driving, James "reached up in front of him, had a knife in his hand, put the knife to Fagan's throat and took [Fagan's] gun." Miller also stated that James asked Fagan, "How does it feel to know that this is the last night that you have on earth?" Then, at James's direction, Miller stopped the car in a wooded area. At that point, James exited the car, pulling Fagan with him. James also told appellant to join him. As James, Fagan, and appellant headed towards the wooded area, Miller lost sight of them. About five to ten minutes later, appellant and James returned, without Fagan. According to Miller, James had the gun and his hand was bleeding. When Miller inquired about Fagan, James replied: "He's gone." During the ride to James's apartment, Miller noted that appellant did not say anything.

Miller also said that, a few days later, James asked him to "get the gun," and told him where to find it. Miller and appellant retrieved the weapon and decided to "get rid of the gun." Accordingly, they gave the gun to Miller's friend, from whom it was later recovered by Sergeant Merson.

At trial, the State introduced appellant's statement through Sergeant Merson. Then, during the cross-examination of Merson, defense counsel sought to elicit James's statement, claiming that James was unavailable and that his statement constituted a declaration against penal interest, admissible under Maryland Rule 5–804(b)(3). Following the State's objection, a bench conference ensued at which defense counsel argued vigorously that James's statement was admissible. Pointing to the fact that James's statement was a recorded, custodial statement provided after James had been advised of his constitutional rights, appellant maintained that the trustworthiness of James's statement had been sufficiently established.

The State countered that James's statement was inadmissible because it was a constitutionally protected statement. The prosecutor reasoned that because James properly invoked his

constitutional right not to testify at appellant's trial, James also had the right to prevent appellant's "back door" use of his statement. Given James's valid assertion of his Fifth Amendment privilege, the State claimed that appellant should not be allowed to circumvent James's lawful exercise of his constitutional privilege by introducing his statement through the police. Conceding that the State had introduced James's statement into evidence at James's trial, the prosecutor nevertheless insisted that it had done so without violating James's constitutional rights. The prosecutor said: "The law allowed us to bring it in. We did not abridge any Constitutional rights of Mr. James to bring that statement in at trial."

Further, the State argued:

In this case, this is not [James's] trial and he has exercised his Constitutional right. Maybe defense counsel doesn't like that they can't make him come in and testify but he has a right to do that. They want to go through the back door and bring his statement in any way without his presence.

What Fifth Amendment protection has Mr. James been given in that case? None. You have a right not to testify. If you don't want to testify, the heck with you, we'll let somebody else testify in your place and tell us what you said. Where is his Constitutional protection? There is none.

They are asking you to go through the back door and circumvent the Constitution and bring this evidence in this trial because the defense wants the jury to hear it and for no other reason.

The following discussion at the bench is also pertinent:

[THE PROSECUTOR]: Mr. James has a Constitutional right, a Fifth Amendment right. The Bill of Rights of the Constitution which the defense attorneys are always hammering the State with saying, Mr. James, you made statements, you said these things to a police officer, we want you to come to court and tell us what you told that police officer,

and Mr. James has said, no, I'm exercising my Constitutional right not to have to do that.

Where is Mr. James' protection? Where is there any validity to the right if we say, okay, go back there and sit down again, we'll have somebody else come to court and tell us the words that you said to Sergeant Merson? Where is the protection of the Constitution there?

I don't think the Fifth Amendment allows his statements to come in through the back door because he inconvenienced the defense by exercising his rights, regardless of what the contents of those statements may be.

The statement was made it should come in because it is a statement against his penal interest. That it may be. It is clearly hearsay. Let's start with the proposition it is inadmissible because it is hearsay. The Defendant squeezes it in under that exception. The only reason we have that exception is because normally the reason for the hearsay rule is to keep out testimony or documents that are not credible [sic]. First of all, it is inherently credible. Therefore, it shouldn't come in. Again, it made no difference in this case; it is hearsay, it should not come in. Whether Your Honor thinks it is probably inherently credible—

THE COURT: Isn't it one of the exceptions to a hearsay rule?

[THE PROSECUTOR]: That is regardless. We have to come back to the fact it is constitutionally protected and he exercised his Constitutional rights. Where is the meaning of the Fifth Amendment which we all want to stand behind?

If we go to Mr. James, Mr. James, we want come to court and tell us, it is hearsay and inadmissible, we want you to come to court and tell us what you told Sergeant Merson, he says, no, I don't want those statements coming out, I have a Constitutional right not to do that and I'm exercising that right, the heck with you, we'll have somebody else do that; where is the Constitutional protection there?

The court was understandably puzzled by the State's position as to James's exercise of his Fifth Amendment privilege,

noting that the State was "missing the point on the constitutional issue." The court also acknowledged that, to James's "consternation," the State had used James's statement against James at his trial. Nevertheless, because the court was not satisfied that the statement was sufficiently corroborated so as to render it trustworthy, the court concluded that James's statement was inadmissible as a declaration against interest.[2] The court reasoned:

The Court has heard argument and, of course, this is governed completely by Maryland Rule 5–804.

The Court certainly agrees with the defense on the proposition that the declarant is unavailable. That has been shown through Defense Exhibit 1. So, we satisfy that. The Court disagrees completely with the State's argument. I just think it missed the point completely.

So we get to the issue, and the Court has not resolved the issue. . . . [T]his is governed by 5–804(b)(3). Of course, the last portion of that rule is exactly what we're dealing with here; that is, a statement tending to expose the declarant, which would be Mr. James, to criminal liability, which his statement certainly did, and offered to exculpate the accused, which is exactly what is going on here, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. That is the issue is whether we do have corroborating circumstances which clearly indicate the trustworthiness of the statement.

I think the old law school exam on this is where somebody has been caught red handed with [his] brother, in this case their cousin, and they know they are going down the river so they take the entire hit and make a statement that is inculpatory to them but that exculpates the family member. I think that is given as the example of why you need the extra corroboration. So, this rule really restates the earlier cases.

---

**2.** Although James's statement was not admitted in evidence, it was marked for identification as a defense exhibit and is included in the record.

So, in order to analyze this to that portion of the analysis, that is do we have corroborating circumstances that clearly indicate the trustworthiness, I think for that in fairness to the defense I need to review that statement. I know I tried the case, but I don't know.

\* \* \*

Once again, this court believes that this issue is governed by Maryland Rule 5–804(b)(3). Once again for the record, the issue is dealt with which states, A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

So, certainly I do find that we get down to this point that the declarant is unavailable. I don't buy into the Constitutional arguments of the State. What we're dealing with is are there corroborating circumstances that clearly indicate the trustworthiness of the statement. It is argued by the defendant that the Defendant's apologies at the very end, his emotional makeup at that point indicates the trustworthiness and that should be the trustworthy circumstances. With that, as we all know, I came out and asked for the statement so I could read through the entire statement.

Of course, we do start off with the individuals, the declarant and the accused, being cousins. The evidence in this case is that they are cousins and that they are very close. In the statement itself we have Mr. James stating that he was not there mentally, it is like a blur. At one point in this he didn't know if John was in the car or not. He says most of it is a big blur. At one point he says he doesn't know what happened. At one point in this, as it relates to Akil and they were asking, I think Sergeant Merson was asking Mr. James about a gun and he says I don't want him to get in trouble. It is only when they say he already verified it that he then admits. So, in the statement itself he indicates his attempt and desire not to get the accused in trouble.

So, when I take a look at all of that, I don't feel that there are corroborating circumstances which clearly indicate the

trustworthiness of the statement. On that basis, I will sustain the State's objection to questions as it relates to getting in the statement of Mr. James. At one point in here in discussing the incident he kind of goes both ways. At one point he doesn't know and it is not clear. But then, of course, which is why the defense would like this this [sic] in, he very clearly then says Mr. Roebuck did not participate in the killing, but in an earlier part he is saying he doesn't know what happened, he is not clear. He says I know what I did.

So, on that basis the Court finds the lack of corroborating circumstances to clearly indicate trustworthiness. . . .

We shall include additional facts in our discussion.

### DISCUSSION

### I.

Appellant contends that the trial court erred by precluding him from introducing James's statement into evidence. He argues that, because James was unavailable, and James's statement was sufficiently corroborated, it was admissible under Maryland Rule 5–804(b)(3) as a declaration against penal interest. Therefore, Roebuck asserts that the court erred in finding that the declaration was "unreliable."

The State counters: "Whether statements are sufficiently reliable to justify admission under the exception at issue is a factual determination that falls within the trial court's discretion." Accordingly, it maintains that the trial court neither erred nor abused its discretion.

We begin by setting forth the text of Maryland Rule 5–804(b)(3).

**Rule 5–804. Hearsay exceptions; declarant unavailable.**

\* \* \*

(b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

(3) Statement against interest. A statement which was at the time of its making so contrary to the declarant's pecuniary or proprietary interest, so tended to subject the declarant to civil or criminal liability, or so tended to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

(Italics added).[3]

 The hearsay exception in issue seeks to "balance ... the need for evidence to ascertain truth and the exclusion of untrustworthy evidence." *State v. Anderson,* 141 Wis.2d 653, 416 N.W.2d 276, 280 (1987); *see Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). In order to admit a hearsay statement under Rule 5–804(b)(3), the trial court must determine that: 1) the declarant's statement was against his or her penal interest; 2) the declarant is an unavailable witness; and 3) corroborating circumstances exist to establish the trustworthiness of the statement. *United States v. Garcia,* 897 F.2d 1413, 1420 (7th Cir.1990); *United States v. Harrell,* 788 F.2d 1524, 1526 (11th Cir.1986); *United States v. Mac-Donald,* 688 F.2d 224, 232–33 (4th Cir.1982), *cert. denied,* 459

---

**3.** The Maryland rule concerning statements against interest is derived from the comparable rule contained in the Federal Rules of Evidence. *Gray v. State,* 368 Md. 529, 542 n. 9, 796 A.2d 697 (2002). Therefore, in our analysis, we shall refer to various federal cases that have interpreted the federal rule. *See Beatty v. Trailmaster,* 330 Md. 726, 738 n. 8, 625 A.2d 1005 (1993) (stating that when a Maryland rule is derived from a federal rule, judicial interpretations of the federal rule by the federal courts are persuasive as to the meaning and application of the Maryland rule); *see also Derry v. State,* 358 Md. 325, 348–49, 748 A.2d 478 (2000).

U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983); *United States v. Mock*, 640 F.2d 629, 631 (5th Cir.1981).

■ In this case, the State does not dispute that James, the declarant, was unavailable within the meaning of Md. Rule 5–804(a)(1); that rule defines unavailability to include a declarant who "is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement." Nor does the State challenge appellant's claim that the declaration was against James's penal interest. *See United States v. Wilkus*, 875 F.2d 649, 654 (7th Cir.), *cert. denied*, 493 U.S. 865, 110 S.Ct. 184, 107 L.Ed.2d 139 (1989); *United States v. Candoli*, 870 F.2d 496, 509 (9th Cir.1989). Therefore, the central issue here involves the sufficiency of the corroboration and trustworthiness of the statement.

■ "The burden is on the proponent [of the statement] 'to establish that it is cloaked with 'indicia of reliability' [, which] means that there must be a showing of particularized guarantees of trustworthiness.' " *West v. State*, 124 Md.App. 147, 167, 720 A.2d 1253 (1998), *cert. denied*, 353 Md. 270, 725 A.2d 1068 (1999) (quoting *Simmons v. State*, 333 Md. 547, 560, 636 A.2d 463, *cert. denied*, 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 26 (1994)). A trial court's determination of whether a statement is sufficiently trustworthy to justify admission as a declaration against penal interest is largely a factual determination. *See Powell v. State*, 324 Md. 441, 453, 597 A.2d 479 (1991); *Wilkerson v. State*, 139 Md.App. 557, 576–77, 776 A.2d 685, *cert. denied*, 366 Md. 249, 783 A.2d 223 (2001); *West*, 124 Md.App. at 166, 720 A.2d 1253; *see also Garcia*, 897 F.2d at 1421; *United States v. Briscoe*, 742 F.2d 842, 846–47 (5th Cir.1984). Ultimately, however, whether to admit such a statement calls for the exercise of discretion by the trial court. *Wilkerson*, 139 Md.App. at 577, 776 A.2d 685; *West*, 124 Md.App. at 166, 720 A.2d 1253.

■ The corroboration requirement serves to deter "criminal accomplices from fabricating evidence at trial." *United States v. Camacho*, 163 F.Supp.2d 287, 299 (S.D.N.Y.2001).

As the *Camacho* Court aptly observed, "[t]he requirement of corroboration is easy enough to state in general terms," but gives rise to "some uncertainty with respect to its particular application." *Id.* at 300. Indeed, the precise parameters of sufficient corroboration are not entirely clear. Although a defendant generally must prove that "there are clear indicia of reliability" to meet the requirement of trustworthiness, *Camacho*, 163 F.Supp.2d at 302, there is no litmus test that courts must follow to establish adequate corroboration or trustworthiness. *See Idaho v. Wright*, 497 U.S. 805, 822, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) ("We therefore decline to endorse a mechanical test for determining 'particularized guarantees of trustworthiness' under the [Confrontation] Clause.").

Thus, some courts have said that only "*some* corroborative evidence of the content of the hearsay statement" is required. *See, e.g., Anderson*, 416 N.W.2d at 279 (involving a declarant whose statements exculpated the declarant's brother, who was the defendant in the case, and inculpated the declarant; the court held that "the standard of corroboration is corroboration sufficient to permit a reasonable person to conclude, in light of all the facts and circumstances, that the statement could be true"); *see also Garcia*, 897 F.2d at 1421. Yet, others have adopted a more stringent standard, requiring corroboration that "solidly" or "clearly" demonstrates the trustworthiness of a statement against interest. *See, e.g., United States v. Satterfield*, 572 F.2d 687, 693 (9th Cir.) ("[T]he corroborating circumstances must do more than tend to indicate the trustworthiness of the statement; they must *clearly* indicate it."), *cert. denied*, 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978); *United States v. Barrett*, 539 F.2d 244, 253 (1st Cir.1976) ("[W]e would not read the standard of trustworthiness as imposing a standard so strict as to be utterly unrealistic.... On the other hand, there is no question but that Congress meant to preclude reception of exculpatory hearsay statements against penal interest unless accompanied by circumstances solidly indicating trustworthiness.").

Several Maryland cases have elucidated the issues of corroboration and trustworthiness. In *State v. Standifur*, 310

Md. 3, 526 A.2d 955 (1987), for example, the Court of Appeals considered the reliability of a declaration against penal interest made by an unavailable declarant, offered by the State against the accused in a criminal trial, to determine whether it qualified for admission under the common law exception to the hearsay rule. The *Standifur* Court said, at 310 Md. at 12–17, 526 A.2d 955:

> The circumstances surrounding the making of the statement must be carefully analyzed to determine the likelihood that the statement was truthful. Critical to this analysis is the state of mind of the declarant at the time the statement was made. Unless the declarant then believed the statement to be against his penal interest, there is no basis for presumed reliability. However, because of the unavailability of the declarant and other problems of proof, the party urging this exception is not required to prove the actual state of mind of the declarant but must prove sufficient surrounding facts from which the trial judge may inferentially determine what the state of mind of a reasonable person would have been under the same or similar circumstances....
>
> ... The more important criterion is that a reasonable person in the situation of the declarant would have perceived the statement as disserving at the time he made it....

 \* \* \*

In summary, a trial judge considering the admission of a hearsay statement offered as a declaration against penal interest must carefully consider the content of the statement in light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant, and determine whether the statement was in fact against the declarant's penal interest and whether a reasonable person in the situation of the declarant would have perceived that it was against his penal interest at the time it was made. The trial judge should then consider whether there are present any other facts or circumstances, including those indicating a motive to falsify on the part of the declarant, that so cut against the

presumption of reliability normally attending a declaration against interest that the statements should not be admitted. A statement against interest that survives this analysis, and those related statements so closely connected with it as to be equally trustworthy, are admissible as declarations against interest.

*State v. Matusky*, 343 Md. 467, 682 A.2d 694 (1996), also provides guidance as to the matters of corroboration and trustworthiness. There, the State again sought to introduce a declaration against penal interest that was inculpatory as to the defendant. Because the statement was made by a co-defendant who was to be tried separately, and was thus unavailable, Matusky's constitutional right to confrontation was implicated. The *Matusky* Court explained that, once the proponent establishes unavailability, the trial court must

> "carefully consider the content of the statement in the light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant, and determine whether the statement was in fact against the declarant's penal interest and whether a reasonable person in the situation of the declarant would have perceived that it was against his penal interest at the time it was made."

[*State v. Standifur*, 310 Md.] at 17, 526 A.2d 955. If the hearsay statement passes this part of the test, the trial judge must next consider:

> "whether there are present any other facts or circumstances, including those indicating a motive to falsify on the part of the declarant, *that so cut against the presumption of reliability normally attending a declaration against interest that the statements should not be admitted.*"

*Matusky*, 343 Md. at 479–80, 682 A.2d 694 (*quoting Standifur*, 310 Md. at 17, 526 A.2d 955) (emphasis added).

With regard to a statement against penal interest that is offered to exculpate an accused, some courts have expressed a "specific concern" that "the accused or the declarant, or both,

may have a motive to fabricate the statement." *Anderson,* 416 N.W.2d at 280. In *Camacho,* 163 F.Supp.2d 287, the federal court undertook a thorough review of the statement against penal interest hearsay exception to ascertain the various factors that generally pertain to corroboration and trustworthiness of a declaration against penal interest. Among them, the court observed that the relationship between the declarant and an accused is certainly an important consideration. *Id.* at 306–07. *See, e.g., United States v. Duke,* 255 F.3d 656, 658–59 (8th Cir.) (involving statement by defendant's brother), *cert. denied,* 534 U.S. 1022, 122 S.Ct. 550, 151 L.Ed.2d 426 (2001); *United States v. Katsougrakis,* 715 F.2d 769, 777–78 (2d Cir.1983) (upholding admission of testimony of wife of declarant, because declarant "had no motive to lie to his wife" in describing declarant's participation in defendant's arson scheme), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); *United States v. Silverstein,* 732 F.2d 1338, 1346 (7th Cir.1984) (stating that certain "statements are suspect because of a long-standing concern—whether or not well-founded—... that a criminal defendant might get a pal to confess to the crime the defendant was accused of ..."), *cert. denied,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).

On the other hand, the *Camacho* Court observed that, when "a statement directly inculpates the declarant, and no one else," that circumstance is a factor "in favor of its reliability." *Camacho,* 163 F.Supp.2d at 305; *see Lilly v. Virginia,* 527 U.S. 116, 131, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (noting that confession that inculpates an accomplice is "inherently unreliable."). Moreover, the "extent to which a declarant expects his statement to subject him to criminal liability also reflects on the statement's reliability." *Camacho,* 163 F.Supp.2d at 307; *see United States v. Moskowitz,* 215 F.3d 265, 269 (2d Cir.) (concluding that plea allocution was reliable because declarant was subjected to incarceration), *cert. denied,* 531 U.S. 1014, 121 S.Ct. 571, 148 L.Ed.2d 489 (2000).

Further, the timing of a statement against penal interest is an important consideration. When a statement against

interest is made soon after the event in issue, that factor generally weighs in favor of trustworthiness. *Camacho,* 163 F.Supp.2d at 306; *see Latine v. Mann,* 25 F.3d 1162, 1167 (2d Cir.1994) (noting that a statement made shortly after the criminal incident gives a declarant "little opportunity to reflect on the events and to prepare a story"), *cert. denied,* 514 U.S. 1006, 115 S.Ct. 1319, 131 L.Ed.2d 200 (1995).

█ The consistency of a declarant's statements is yet another factor for a court to consider. *Camacho,* 163 F.Supp.2d at 308; *see U.S. v. Doyle,* 130 F.3d 523, 544 (1997). In *United States v. Bahadar,* 954 F.2d 821, 829 (2d Cir.), *cert. denied,* 506 U.S. 850, 113 S.Ct. 149, 121 L.Ed.2d 101 (1992), the court observed: "Repeated changes in [the declarant's] story—would make any district judge suspicious of the statement's reliability."

█ Additionally, courts tend to regard as reliable those statements that are made spontaneously, rather than "in response to coercive questioning by police officers...." *Camacho,* 163 F.Supp.2d at 306. In particular, statements given to the police are not necessarily perceived as reliable when they exculpate the declarant but inculpate someone else. Instead, such statements are regarded as an attempt by the "declarant ... to obtain favorable treatment." *Camacho,* 163 F.Supp.2d at 308; *see Garcia,* 897 F.2d at 1421.

To effectuate the objective of preventing fabrication, the Second Circuit previously required corroboration of both "the *declarant's* trustworthiness as well as the *statement's* trustworthiness." *Bahadar,* 954 F.2d at 829 (emphasis in original). That position was later rejected by the Second Circuit in *Doyle,* 130 F.3d 523. There, the Second Circuit explained: " 'It is the statement, not the witness or the declarant, that must be trustworthy.' " *Id.* at 544 (citation omitted). Relying on 5 WEINSTEIN's FEDERAL EVIDENCE § 804.06[5][c], the *Doyle* Court stated that "[t]he corroboration requirement should not be used as a means of usurping the jury's function" of assessing the credibility of witnesses. *Id.* Nevertheless, the *Doyle* Court recognized that the "credibility of an absent

declarant is a consideration pertinent to the probative value of his or her testimony and, thus, relevant to a judge's decision to admit or exclude evidence under ... FED.R.EVID. 403, even if not a proper question ... under Rule 804." *Doyle*, 130 F.3d at 544.

*United States v. Desena*, 260 F.3d 150 (2d Cir.2001), is also instructive. There, the court's analysis of corroboration focused only on the trustworthiness of the out-of-court statement, and not on that of the declarant or the witness who related the statement. The court concluded that the declarant's statement was admissible as a declaration against penal interest because the declarant, who had invoked his Fifth Amendment right not to testify, was unavailable; the declarant's admission of arson was a statement against penal interest; and the trustworthiness of the statement was corroborated by the testimony of another witness, "whose description of the scene of the arson the day of the crime (a) matched [the declarant's] description of [the defendant's] actions and (b) substantiated the motive offered by [the declarant]." *Id.* at 158–59.[4]

With this background in mind, we turn to consider the recent decision of the Court of Appeals in *Gray v. State*, 368 Md. 529, 796 A.2d 697 (2002). There, the Court reversed the defendant's conviction because the trial court did not admit a declaration against penal interest.

In *Gray*, the defendant was convicted of the first degree murder of his wife, Bonnie Gray, whose body was discovered in the trunk of her car. The defense's theory was that the victim was murdered by her lover, Brian Gatton. At trial, the defendant sought to introduce hearsay statements made by

---

4. Interestingly, notwithstanding the Second Circuit's decision in *Desena*, the federal district court in *Camacho* relied on *Doyle* and concluded that it was appropriate to consider the trustworthiness of both the declarant and his declarations, 163 F.Supp.2d at 302, regardless of whether the task "is undertaken solely as part of the corroboration requirement of Rule 804(b)(3) ... or as the result of an interaction between Rule 804(b)(3) and Rule 403...." *Camacho*, 163 F.Supp.2d at 302.

Gatton to Evelyn Johnson, claiming the remarks were declarations against penal interest. Because the statements in issue "were to the effect that he, Gatton, had killed the victim," *id.* at 534, 796 A.2d 697, they were exculpatory as to the accused.

The State filed a Motion in Limine to bar the admission of Gatton's statements to Johnson, arguing that Johnson was not credible, and therefore the trial court should find that Gatton did not make the statements. *Id.* at 538, 796 A.2d 697. As the Court of Appeals recounted, appellant proffered:

> Evelyn [Johnson] would testify that Gatton was an occasional visitor in her home, and that on one or more occasions he had been accompanied by Bonnie Gray, the deceased, whom he identified as his girlfriend. Evelyn alleged at one point in her testimony that on one occasion she heard Gatton and Bonnie arguing with Gatton repeatedly telling Bonnie that "he was never going to let her go no matter what she did." On that occasion, Bonnie left the Johnson residence before Gatton, and Gatton subsequently stated: "[T]hat bitch pissed me off" and "if he couldn't have her no one would." After Bonnie's disappearance, but before the discovery of her body, he told Evelyn that "I took care of her," meaning Bonnie.
>
> It was further proffered that Evelyn would have testified that on a subsequent occasion Gatton came to her house when her husband was away and raped her. Several days afterwards, she testified that he threatened her saying, "[I]f I told [anyone about the rape] he would take care of me just like he took care of Bonnie." Evelyn would have testified that on that occasion he pulled a small handgun from his boot and also a hunting knife from a "case" on his belt, showing them to Evelyn, and saying, "[T]his is what I killed her with." There was also testimony that Evelyn had not initially proffered this information to investigators because she was afraid to get involved. She "didn't want to be the next one dead."

*Id.* at 535–36, 796 A.2d 697.

The trial court concluded that Johnson's hearsay testimony was inadmissible under the declaration against penal interest

exception, because the statements were not trustworthy. In the trial court's view, a reasonable man would not have understood "that he was making a statement against penal interest." *Id.* at 537, 796 A.2d 697. Moreover, the trial court found that Johnson, the "relator" of the statements, was not credible.

Even without Gatton's statements, the defense pursued the contention that Gatton was the murderer. The defendant presented evidence with respect to the amorous relationship between Gatton and Ms. Gray; Gatton's drug use; Gatton's "obsession" with knives; and Gatton's possession of jewelry similar to that which had been worn by Ms. Gray but was missing from her body. *Id.* at 533–34, 796 A.2d 697. The defense also summonsed Gatton as a witness. Outside the jury's presence, Gatton invoked his Fifth Amendment right against self-incrimination. *Id.* at 534, 796 A.2d 697. Thereafter, the trial court refused to allow the defendant to question Gatton, and did not require Gatton to invoke his privilege in the jury's presence. Indeed, the jury was never informed as to what had occurred.

On appeal, Gray claimed, *inter alia,* that the trial court erred in excluding Gatton's statements from evidence, which exculpated the defendant and instead indicated that Gatton had committed the offense. Claiming that the determination of Johnson's credibility was a matter for the jury to resolve, Gray argued that the trial court erred in finding that she was not credible, and in finding that Gatton's statements had never been made. *Id.* at 533, 796 A.2d 697. The Court of Appeals agreed with the defendant that the trial court erred in making a determination as to Johnson's credibility, and in refusing to admit Gatton's statements to Johnson. Accordingly, it reversed.

As the Court observed, many of the cases concerned with the declaration against interest involve statements made by an unavailable declarant, offered by the State, which exculpated the declarant and inculpated the defendant. *Id.* at 542, 796 A.2d 697. As examples, the *Gray* Court cited *State v. Ma-*

*tusky, supra,* 343 Md. 467, 682 A.2d 694, and *State v. Standifur, supra,* 310 Md. 3, 526 A.2d 955. In contrast to those cases, the Court pointed out that the *Gray* case did not involve a statement that was adverse to the defendant's penal interest. Rather, the statement in issue was exculpatory as to the defendant, and thus it was the defendant, not the State, who sought the admission of the hearsay statement. Given that it was the defendant who sought to introduce Gatton's hearsay statements, the *Gray* Court noted that the defendant's "constitutional right to confront the witnesses *against* him [was] not implicated." *Gray,* 368 Md. at 538, 796 A.2d 697 (emphasis in original). *See also Williamson v. United States,* 512 U.S. 594, 605, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994); *Wilson v. State,* 334 Md. 313, 322–27, 639 A.2d 125 (1994); *Simmons v. State, supra,* 333 Md. at 555–61, 636 A.2d 463.

After reviewing *Standifur* and *Matusky,* the *Gray* Court addressed the "necessity for a trustworthiness assessment when the admissibility of these types of statements are being considered." *Gray,* 368 Md. at 543, 796 A.2d 697. In the first instance, the Court made clear that the issue of trustworthiness concerns the statement by the unavailable declarant, "not the trustworthiness (i.e., credibility) of the in-court witness relator of the out-of-court declaration." *Id.* Therefore, the Court underscored that it was the function of the trier of fact to assess the credibility of Johnson as the "in-court relator" of the declarant's statement. *Id.* at 545, 796 A.2d 697. The Court explained:

There is nothing in . . . any of our cases of which we are aware, that in a jury trial specifically permits a trial court to make a factual assessment of the trustworthiness of the in-court relator of the out-of-court declaration that exculpates a defendant. The credibility of the witness in such cases is normally to be assessed as witness credibility is generally determined-by the trier of fact.[1] An in-court relator of what she has heard outside the courtroom is, normally, as to whether she actually heard the declaration, in the same witness situation as an in-court relator of what they have seen outside the courtroom. Generally, credibility is tested

by examining the witness, especially by cross-examination of the witness by the opposing party, which in the present case at the pre-trial hearing was vigorous and extensive. In a jury trial, it is, generally, not the court's function to assess that type of credibility.

*Id.* at 545, 796 A.2d 697 (footnote omitted).

The *Gray* Court was satisfied that Gatton's statements were against his penal interest. It reasoned, at 368 Md. at 546–47, 796 A.2d 697:

[T]he fact that Gatton may have been attempting to intimidate Evelyn does not detract from the fact that he, and indeed any reasonable person, would know that the statements he was making about his lover, the petitioner's murdered wife and the woman Gatton was declaring he had killed, however it was used by him, was a statement against his penal interest.

Of significance here, the Court was also satisfied that Gatton's statements were adequately corroborated. The Court said: "It was not just a statement that [Gatton] had murdered a specific person with whom he had a relationship. His statement was corroborated by the circumstance that the specific person had, in fact, been murdered." *Id.* at 547, 796 A.2d 697. The Court also found corroboration based on the evidence of the "love triangle." Additionally, it found corroboration from Ms. Johnson's husband, who testified that Gatton had been in the Johnson home. Further, the Court pointed to the evidence that Gatton was in possession of jewelry that resembled the victim's jewelry. *Id.* at 546, 796 A.2d 697. Accordingly, the Court concluded, at 368 Md. at 547, 796 A.2d 697:

Under the circumstances here present, petitioner was entitled to present his defense, *i.e.*, that Gatton killed Bonnie Gray. When Gatton, through the invocation of his right to remain silent became unavailable, petitioner was, under the facts of this case, entitled to present to the jury Gatton's declarations against penal interest through the person that allegedly heard the declarations, Evelyn Johnson. Under

the circumstances here present, it was error to deny their admission.

In our view, *Gray* inescapably leads us to conclude that the court below erred in barring the admission of James's statement on the ground of insufficient corroboration and lack of trustworthiness. If the Court determined that Gatton's statement was sufficiently corroborated, a similar result attaches here. We explain.

At the outset, we observe that, in this case, as in *Gray*, it was the defendant, not the State, who sought to admit the out-of-court statement, claiming it was inculpatory as to the declarant and exculpatory as to appellant. Thus, the confrontation clause is not implicated here.

The opinion of the trial court reveals that it found James's statement untrustworthy essentially for two reasons. First, the court pointed to the blood relationship between the declarant and appellant, stating that they are cousins and they are "very close. . . ." Second, the court pointed to the content of James's statement, which the court said showed James's "attempt and desire not to get the accused in trouble."

The familial ties between James and appellant were certainly a factor for the court to consider. But, that relationship did not compel the court to. conclude that the statement was unreliable. Indeed, the State has not provided us with any authority that suggests that, on the basis of such familial ties alone, it is appropriate for a court to bar the use of a declaration against penal interest that is arguably exculpatory as to a defendant and thus central to the defense case.

The second ground expressed by the court concerned James's desire not to get appellant in trouble. As we see it, the court did not fully consider the context in which that comment was made.

In support of the court's assertion that James expressly indicated that he did not want to implicate appellant, the court pointed to James's response when Sergeant Merson asked James about the whereabouts of the gun. It was at that point

that James responded that he did not want to get appellant in trouble. The court also said that the declarant only gave his answer to Merson after Merson told James that he already had the information about the gun.

James's remark about not wanting to get appellant in trouble is found on pages 34 and 35 of a statement that is almost 40 pages in length. The following exchange during James's interrogation is in issue:

[MERSON]: Did you get back into the car [after the murder]?

[JAMES]: I got dragged back into the car.

[MERSON]: You got dragged back? By Akil [i.e., appellant]?

[JAMES]: By him just holding me up and cussing me out and telling me, just cussing me and just keep telling me I turned around and said Akil that was not me.

[MERSON]: Okay. Did you, did you go anywhere else after that? Or did you go straight home?

[JAMES]: I just remember waking up next to Ayanna.

[MERSON]: *Okay where did the gun go? Did you still have the gun? You're shaking your head, no.*

[JAMES]: *No.*

[MERSON]: Where did it, where did it, *do you know where the gun went?* Did somebody get rid of it for you? Do you remember a couple of days later you wouldn't have been high. A couple of days later somebody asking you to or you asking them to get rid of the gun and they agreed to do it?

Okay who was that?

[JAMES]: *I don't want to get him in trouble.*

[MERSON]: You don't want to get him in trouble then. He's already admitted it himself. We just wanted to make sure that? [sic]

[JAMES]: Akil.

[MERSON]: Akil? Okay. Did he get rid of that gun for you? You don't know? You gave it to him? You got rid of the knife yourself?

[JAMES]: I just wanted to pray that it never happened.

Significantly, the above colloquy, on which the court relied, concerned events that happened *after* the murder, and *after* James had already implicated himself *and* made remarks that were exculpatory to appellant. In other words, the discussion about the gun took place *after* James had already related the details of the murder. Additionally, James's desire not to get appellant in trouble as to the location of the gun did not demonstrate that James sought to cover up appellant's role in the murder itself.

The court's oral ruling indicates that it failed to consider the ample evidence offered by the State that corroborated James's statement. Again, we explain.

First, the "extra corroboration" sought by the court was provided by the fact that the State's theory of appellant's role in the murder was largely consistent with James's statement. The State never suggested that appellant was the one who stabbed or shot the victim. Rather, the State contended that appellant was the one who handed the gun to James, and that appellant was an aider and abetter. During closing argument, the prosecutor said:

[B]ut for [Roebuck] handing that handgun to Bible [*i.e.*, James], Jacoby Fagan might sit in this courtroom today and tell you who assaulted him. If [appellant] had told Bible, no, I'm not involved in this, I'm going back to the car, I'm out of here, Jacoby Fagan might sit in this courtroom today and tell you how Bible assaulted him.

But he is not here today for one reason and one reason only; his act of handing that gun to Bible. That was the coup de grace and that killed Jacoby Fagan right there, regardless of who pulled the trigger.

He gives testimony that I was telling Bible, come on, you have to leave, trying to pull him off the kid. If he wanted Bible not to assault Jacoby Fagan anymore, he wouldn't have handed him the handgun. He wasn't trying to pull him off the kid. The kid was still alive. Jacoby Fagan was still alive after all of these superficial wounds. When you

try to murder somebody, you can't leave them alive to testify; you give them the coup de grace, the three gunshot wounds to the head. That was his concern about getting his cousin off and getting him out of there.

In addition, the prosecutor argued:

When all the stabbing and cutting took place and he was standing there watching, certainly at that point it occurred to [Roebuck] we're really going to kill this kid tonight, that's the plan, and he stayed there. He's the only one armed of the bunch and had done nothing up to that point. He certainly could, as he stood there watching this kid die—it takes a long time to cut a throat and slash somebody thirty-six times. He had the opportunity to think and deliberate and say, no, this is horrible, I'm not going to be part of this and turn around and walk out.

Moreover, there is no indication that the court considered Miller's testimony with regard to the matter of corroboration. Although Miller was not an eyewitness to the actual murder, the State obviously regarded him as a key witness, and his testimony corroborated much of what James said.

As we indicated earlier, Miller testified that he drove with appellant, James, and Fagan to the wooded area where Fagan was murdered; James took Fagan out of the vehicle; and James was holding the gun when he returned to the car with appellant. Further, he provided other important details about the events before the murder, which were consistent with James's account. For example, Miller testified that the four young men were together on the night in question, and that there was an argument between James and Fagan. Also, he related that James had threatened Fagan.

James's declaration was a custodial, recorded statement given to the police after James had been advised of his constitutional rights. Significantly, the statement was the subject of a motion to suppress filed by James, which was denied by the court. We cannot overlook that the State certainly regarded James's statement as reliable, in that the State introduced it into evidence at James's trial. Even if the State

may take seemingly inconsistent positions as to the statement, vouching for all or part of it in one case while repudiating it in another case, the fact that the State had relied on James's statement was certainly an important factor with respect to the court's corroboration analysis. Put another way, because the State touted James's statement as trustworthy in its case against James, the court should have considered the State's reliance on James's statement as a factor with respect to the trustworthiness of James's statement.

In reaching our conclusion, we are mindful that "the exclusion of a statement exculpating an accused could result in an erroneous conviction." *Anderson,* 416 N.W.2d at 280. Moreover, given a defendant's constitutional right to present a defense, *id.* at 279, a defendant should not be subjected "to an insurmountable evidentiary hurdle" to obtain admissibility of a hearsay statement that is central to the defense and has been sufficiently corroborated. *Id.* at 280. Ultimately, it is for the fact finder to assess the veracity of the declaration. *Id.*

In sum, although the declarant and the accused are relatives, that relationship did not compel the court to find James's statement unreliable. James's declaration against penal interest was made within a relatively short time after the murder, and it was consistent with the State's theory of the case against appellant. Moreover, the State had previously vouched for James's statement when it offered the statement into evidence in its case against James. Further, the one aspect of the statement that troubled the court concerned events that occurred *after* the murder. Finally, the court never considered that material aspects of the statement were corroborated by Miller, the State's key witness. For all of these reasons, we conclude that the trial court erred in its ruling as to James's statement.

## II.

Dr. James Locke, the Assistant Medical Examiner, performed the autopsy on Fagan's body. During the State's

examination of Locke, the State sought to introduce several enlarged color photographs that graphically depicted some of Fagan's wounds. Defense counsel objected, noting the inflammatory nature of the photographs. In addition, the defense asserted that the photographs lacked probative value, because the manner of death was not in dispute. The trial court overruled appellant's objection.

Appellant complains that the court abused its discretion by admitting the photographic enlargements. In his brief, appellant characterizes the photographs as "shocking," "gruesome," "disturbing," and "inflamatory." Given that it was uncontroverted that appellant was with James when Fagan was attacked, and appellant acknowledged that he gave James the gun that James used to shoot Fagan, appellant maintains that "no dispute existed as to . . . the manner of death." Therefore, he maintains that the State had no legitimate purpose in using the photographs. Further, appellant contends that the probative value, if any, was outweighed by the prejudice to appellant.

At trial, the following discussion ensued with regard to the photographs:

[APPELLANT'S ATTORNEY]: . . . . Your Honor, the reason that I asked to come up before the next exhibits were offered for identification is because they are obviously color photographs of some of the autopsy findings described by Dr. Locke. The record should indicate that these are blowups and closeups in color, vivid color of graphic wounds.

I'm going to ask Your Honor not to allow these to be introduced into evidence for the reason that they are inflammatory. The reason that they are in color is nothing more—it is for the purpose of nothing more than to inflame the observer of these photos. The Medical Examiner's Office can certainly take black and white photos. They were taken in color and indeed there may be black and white photos.

In any event, Your Honor, the photos are graphic, as we told the jury that there would be graphic evidence, but I

don't believe that they serve any probative value because we are not contesting in any way the manner in which Mr. Jacoby [sic] died or the circumstances surrounding his death as such. These photographs certainly don't assist the jury in any way at arriving at what is the crux of this trial; that is, Mr. Roebuck's participation in this event.

So, therefore, because we believe they are very inflammatory, I would ask that they not be admitted into evidence when the State is going to admit them into evidence.

\* \* \*

[PROSECUTOR]: I'll agree that they are God awful, but they are God awful because that is the state that Jacoby Fagan was left in the woods that day. They haven't been enhanced in any way by the State. They are color photographs because they were taken from negatives, but these are the color photographs. They were taken at the time of the autopsy. They are submitted just to show the number of wounds and where they were placed. There is nothing to enhance it in any way or to inflame the jury. They are simply photographs of wounds observed on his body.

Your Honor, it is going to become relevant to the evidence. I propose to ask Dr. Locke to describe the place and types of wounds, but I think it is important what types of wounds that we're talking about here and show the jury which were the stab wounds, the cutting wounds and the wounds to the head. It will become relevant in Dr. Locke's testimony, because I'll proffer to the Court after he explains the wounds to the jury he will testify which ones are potentially survivable and which ones were not. To do that he has to differentiate between the wounds.

The court overruled the defense's objection. The photographs were then displayed to the jury on two large posterboards, admitted as State's Exhibits 2 and 3.

State's Exhibit 2 consisted of four color photographs. One measures 15 inches by 11 inches; another measures 16 inches by 12 1/4 inches; and two are 14 inches by 10 inches. Photo number one depicts numerous cutting or stabbing wounds on

Fagan's left shoulder, and photo two shows several other wounds. Some of the wounds shown in the photos were oozing blood at the time of the photograph. Photo three is a close-up of an incision on Fagan's neck, just below the chin, spreading almost from one ear to the other. Photo four is a photograph of the back of Fagan's head, and shows several stab wounds and three gunshot wounds.

State's Exhibit 3 contains seven color photographs, each depicting numerous wounds.[5] Most of the pictures on State's Exhibit 3 are smaller than those on State's Exhibit 2, although the photographs each depict multiple bloody wounds.

To be admissible, photographs must be relevant, *Bedford v. State*, 317 Md. 659, 676, 566 A.2d 111 (1989), and introduced for a "legitimate purpose." *Conyers v. State*, 354 Md. 132, 187, 729 A.2d 910, *cert. denied*, 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999). Photographic evidence of crime scenes and autopsy photographs of homicide victims are often relevant to a broad range of issues, including "the type of wounds, the attacker's intent, and the modus operandi." *State v. Broberg*, 342 Md. 544, 553, 677 A.2d 602 (1996).

For example, photographic evidence may be highly probative of the degree of murder. *See Reid v. State*, 305 Md. 9, 20–21, 501 A.2d 436 (1985); *Price v. State*, 82 Md.App. 210, 223, 570 A.2d 887, *cert. denied*, 320 Md. 16, 575 A.2d 742 (1990). In *Johnson v. State*, 303 Md. 487, 502, 495 A.2d 1 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986), the Court explained: "On certain occasions, photographs have also been admitted to allow the jury to visualize the atrociousness of the crime—a circumstance of much import where the factfinder must determine the degrees of murder." Moreover, as the State suggests, this is a case in which "the grisliness of the evidence ... is probative." It reasons that "the jury must evaluate the number and nature of the specific wounds, as well as the circumstances surround-

---

**5.** Photo six on State's Exhibit 3 is the only one in the group of eleven photos that does not depict Fagan's injuries.

ing their infliction, to determine the presence *vel non* of premeditation, wilfulness and deliberation."

To be sure, photographs are often used to illustrate something that has already been presented through testimony. *See Grandison v. State,* 305 Md. 685, 730, 506 A.2d 580, *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986). Even if a defendant stipulates to the facts that the photographs are offered to prove, photographs may be admissible. *Broberg,* 342 Md. at 554, 677 A.2d 602. In *Broberg,* the Court recognized that "photographs do not lack probative value merely because they illustrate a point that is uncontested." *Id.*

*Grandison,* 305 Md. at 730, 506 A.2d 580, is also instructive. There, the Court rejected the appellant's claim that photographs of the victims taken before their deaths and at the autopsies were erroneously admitted at trial. *Id.* at 729–30, 506 A.2d 580. The Court reasoned:

> Not only is the admissibility of such evidence clearly within the trial court's sound discretion, but we have had occasion to recognize as proper the exercise of such discretion in receiving into evidence at trial photographs depicting the condition of the victim and location of injuries upon the deceased, and the wounds of the victim.
>
> \* \* \*
>
> Nor are the particular photographs inflammatory to the jury solely on the basis that they do not represent any issue in controversy. Further, since the photographs are mere graphic representations of undisputed facts already in evidence, their introduction could not be held to have injured the accused.

*Id.* (internal citations omitted).

Even when photographs are relevant, however, the trial court must balance the probative value against the potential prejudice to the defendant. *Broberg,* 342 Md. at 552–55, 677 A.2d 602. In *Broberg,* the Court stated: "[T]he general rule regarding admission of photographs is that their prejudi-

cial effect must not substantially outweigh their probative value." *Id.* at 552, 677 A.2d 602; *see* Md. Rule 5–403.

Nevertheless, the trial court is vested with discretion in regard to balancing probative value against prejudice. And, the court's decision will not be disturbed on appeal in the absence of abuse. *Broberg,* 342 Md. at 554–55, 677 A.2d 602. Indeed, as the Court observed in *Hunt v. State,* 312 Md. 494, 505, 540 A.2d 1125 (1988), in regard to the admissibility of photographic evidence of victims, it has "seldom found an abuse of a trial judge's discretion in admitting them into evidence," even when such evidence tends to be "more graphic than other available evidence." *See also Grandison,* 305 Md. at 729–30, 506 A.2d 580; *Johnson,* 303 Md. at 502, 495 A.2d 1 ("A court's determination in this area will not be disturbed unless plainly arbitrary. Under this standard, we have permitted the reception into evidence of photographs depicting the . . . wounds of the victim . . . .").

With respect to the issue of prejudice, it is noteworthy that, during voir dire, the trial court posed the following question: "The State's case will include graphic evidence of numerous injuries to the victim. Does any member of the panel feel that due to this type of evidence or the serious nature of the case that you would be unable to render a fair and impartial verdict?" Members of the venire panel who responded affirmatively were questioned at the bench and were stricken for cause at defense counsel's request.

Here, the State proceeded on the theory that James was the one who committed the stabbing and pulled the trigger, while appellant acted as an aider and abetter. In order to convict appellant of first degree murder, the State was required to prove appellant's intent and premeditation. *See Oates v. State,* 97 Md.App. 180, 187, 627 A.2d 555 (1993). To refute the defense's contention that only James was guilty of the murder, the State used the photographs to underscore the magnitude and number of the victim's multiple injuries. It was the nature and number of the injuries that proved important to

the State's case with respect to the elements of intent and premeditation.

In closing argument, the prosecutor highlighted that it was the gunshot wounds to the victim's head that were fatal; those injuries followed the numerous stabbing and cutting wounds that appellant witnessed, and occurred because appellant gave James the gun, despite his knowledge of the multiple stabbings inflicted upon Fagan. The prosecutor argued that, notwithstanding the "nasty" appearance of those stabbing and cutting wounds, as depicted on State's Exhibit 2, they were "survivable," because all but two of them were "superficial." Under the right circumstances, according to the State, the victim might have survived, but for the gun blasts. The State maintained that, after appellant saw what occurred as to the stabbings, he still opted to hand the gun to James.

Whether the photographs were too graphic or too large was a matter for the trial court to decide in the exercise of its discretion. We are satisfied that the court did not abuse its discretion merely because the State might have accomplished its objective with the use of smaller or fewer photographs. To the contrary, the trial court was entitled to conclude that the probative value of the photographs outweighed any prejudice. Therefore, we perceive neither error nor abuse of discretion.

**JUDGMENT OF CONVICTION VACATED.**

**CASE REMANDED TO THE CIRCUIT COURT FOR HARFORD COUNTY FOR FURTHER PROCEEDINGS.**

**COSTS TO BE PAID 50% BY HARFORD COUNTY AND 50% BY APPELLANT.**