*Lamont Smith v. State of Maryland*
No. 573, Sept. Term 2022
Opinion by Leahy, J.

**Preservation > Confrontation Clause and Maryland Rule 5-804(b)(3)**
Though the Confrontation Clause and Rule 5-804(b)(3) are interrelated, "it is well-settled that the two grounds are not synonymous or coextensive; thus objecting on one ground does not preserve the other ground." *Collins v. State*, 164 Md. App. 582, 605-06 (2005).

**Evidence > Maryland Rule 5-804(b)(3) > Statement Against Interest > Corroborating Circumstances > Trustworthiness**
Maryland Rule 5-804(b)(3) instructs that a statement "tending to expose the declarant to criminal liability and offered in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." We hold that the trial court's finding that there were sufficient corroborating circumstances establishing the trustworthiness of the Blake Interview was not clearly erroneous. It is clear, from the content of the interview and from the external circumstances, that declarant had intimate knowledge of and involvement in the drug distribution enterprise. Furthermore, declarant's statements regarding his role in the enterprise, and the role of Appellant, were corroborated by other evidence produced at trial.

**Evidence > Maryland Rule 5-804(b)(3) > Statement Against Interest > Parsing**
After determining that a statement as a whole is averse to the declarant's penal interest, the court must parse through the statement and "'and determine the separate admissibility of each single declaration or remark'" in the larger narrative. *State v. Matusky*, 343 Md. 467, 492 (1996) (quoting *State v. Mason*, 460 S.E.2d 36,45 (W. Va. 1995)) (cleaned up).

**Evidence > Maryland Rule 5-804(b)(3) > Statement Against Interest > Parsing**
We hold that the trial court erred by admitting the *entire* version of the Blake Interview offered by the State under the statement against penal interest exception to the hearsay rule set forth in Maryland Rule 5-804(b)(3) without parsing the narrative and redacting those portions not genuinely self-inculpatory as to Mr. Blake. The court needed to inquire whether each of the statements in the Blake Interview was truly self-inculpatory. *State v. Matusky*, 343 Md. 467, 485 (1996).

**Evidence > Maryland Rule 5-804(b)(3) > Statement Against Interest > Parsing**
Although statements contained in an interview naming a co-conspirator and describing the mechanics of a conspiracy can qualify as statements against penal interest when they sufficiently inculpate the declarant, that does not discharge the court's fundamental duty to parse all of the statements in the interview. Here, although some statements could be deemed equally inculpatory of both Mr. Blake and Appellant, other statements could not be considered genuinely inculpatory of Mr. Blake because they merely served to shift blame for the present workings of the enterprise.

Circuit Court for Wicomico County
Case No.C-22-CR-19-000554

LAMONT SMITH

v.

STATE OF MARYLAND

Kehoe,
Leahy,
Zic,

JJ.

Opinion by Leahy, J.

Filed:  July 26, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

\* During the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland.  The name change took effect on December 14, 2022.

Police found large quantities of CDS and some ammunition inside a house they raided on August 9, 2019, in Salisbury, Maryland. They arrested the residents, Mr. Tony Blake and Mr. Dwight Woods. They also arrested Mr. Lamont Smith ("Appellant"), who claimed he was an overnight guest.

The State brought 42 charges against Appellant: 41 related to his alleged possession, conspiracy to possess, intention to distribute, and conspiracy to distribute the CDS; and one count of illegal possession of ammunition. The State also brought charges against Mr. Woods, but not against Mr. Blake, who was terminally ill and required medical care and supervision.[1] The police returned to the house to interview Mr. Blake and recorded that interview on a Bodycam (the "Blake Interview"). Appellant's primary contentions on appeal surround the admission of the Blake Interview, over his objection, at his trial before a jury in the Circuit Court for Wicomico County in April 2022.

Appellant was acquitted or found not guilty of 30 counts, including all of the Drug Kingpin charges, but he was convicted of counts 30-41 for possession and conspiracy to possess heroin, fentanyl, cocaine, and alprazolam. On May 27, 2022, the court merged Appellant's eight conspiracy convictions into four and sentenced Appellant to an aggregate of four years in prison.[2]

---

[1] The record does not indicate the date of Mr. Blake's death, only that it occurred sometime between the September 14, 2020, motions hearing and the start of trial on April 11, 2022.

[2] At the time of his sentencing on May 27, 2022, Appellant had spent 13 months incarcerated and 20 months in home confinement. Appellant was credited with 33 months of time served and committed to complete the remainder of his sentence in state custody.

Appellant noted a timely appeal and presents the following questions for review, which we rephrase as:[3]

I. Did the trial court violate Appellant's constitutional rights under the Confrontation Clause and Article 21 of the Maryland Declaration of Rights when it admitted the recorded police interrogation of Mr. Blake, an unavailable State witness?

II. Did the trial court misapply the statement against penal interest hearsay exception under Maryland Rule 5-804(b)(3) when it admitted the recorded police interrogation of Mr. Blake?

III. Did the trial court err in failing to vacate all but one of Appellant's conspiracy sentences where the State failed to prove the existence of multiple conspiracies?

We do not reach the merits of Appellant's first question concerning whether admission of the Blake Interview violated his right to confront adverse witnesses under the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights because the issue was not preserved for our review. *See* Md. Rule 8-131(a). Furthermore, consistent with "'the established principle that a court will not

---

[3] Appellant presents the questions as follows:

I. "Did the trial court violate Mr. Smith's right of confrontation when it admitted a recorded police interrogation of Tony Blake, an unavailable State witness?"

II. "Did the trial court misapply the statement against penal interest hearsay exception under Maryland Rule 5-804(b)(3) when it admitted the entire recorded interrogation of Mr. Blake without evaluating each statement for admissibility?"

III. "Did the trial court err in failing to vacate all but one of Mr. Smith's conspiracy sentences where the State failed to prove the existence of multiple conspiracies?"

decide a constitutional issue when a case can properly be disposed of on a non-constitutional ground,'" *Dorsey v. State*, 356 Md. 324, 342 (1999) (quoting *Telnikoff v. Matusevitch,* 347 Md. 561, 579 n.15 (1997)), we need not reach the question of whether admission of the Blake Interview violated Appellant's rights under the United States and Maryland Constitutions because we are vacating Appellant's convictions under Maryland Rule 5-804(b)(3). We hold that the trial court erred by admitting the *entire* version of the Blake Interview offered by the State under the statement against penal interest exception to the hearsay rule set forth in Maryland Rule 5-804(b)(3) without parsing the narrative and redacting those portions not genuinely self-inculpatory as to Mr. Blake. The court needed to inquire whether each of the statements in the Blake Interview was truly self-inculpatory. *State v. Matusky*, 343 Md. 467, 485 (1996). Although some statements, especially those which described the workings of the enterprise prior to Mr. Woods entering the picture, could be deemed equally inculpatory of both Mr. Blake and Appellant, other statements could not be considered genuinely inculpatory of Mr. Blake because they merely served to shift blame for the present workings of the enterprise.

Correspondingly, because we are vacating the convictions, we do not reach the uncontested question of whether the trial court erred by imposing separate sentences for multiple conspiracy charges. However, we observe that the State's suggestion is correct that if this matter is re-prosecuted on remand, then the State may only pursue a single conspiracy charge against Appellant because the State concedes that it failed to prove the existence of more than one conspiracy.

3

## BACKGROUND

The following factual account is drawn from the evidence presented at Appellant's jury trial conducted on April 11 and 12, 2022.

Sergeant Tyler Bennett and Detective Andrew Riggin of the Wicomico County Sherriff's Office testified that in July 2019, their office put a house in Salisbury under surveillance after receiving information that it was being used for heroin sales. Detective Michael Kirkland, working undercover, made four purchases of controlled substances from Mr. Blake and Mr. Woods in July and early August 2019.

Det. Riggin obtained a search and seizure warrant for the house. Then, on August 9, 2019, at 5:00 a.m., a Sherriff's Office Emergency Response Team lead by Sergeant Jordan Banks[4] raided the house and found large quantities of CDS, some ammunition, and over $8,000 in cash. Sgt. Banks testified that "[e]verybody appeared to have been asleep[,]" although the evidence suggested that upon the officers' arrival, Mr. Woods woke up and threw CDS out a broken window in the living room where he had been sleeping on a mattress. The officers discovered Appellant on a second mattress in the same room, and Mr. Blake in a back bedroom.

All three men were arrested. The State ultimately brought charges against Mr. Woods and Appellant, but not against Mr. Blake because he was terminally ill and required medical care and supervision. Mr. Woods was convicted prior to Appellant's trial. *See Woods v. State*, No. 1878, Sept. Term 2021, slip op. at 6-7 (filed Nov. 1, 2022).

---

[4] At the time of the raid, Jordan Banks was a police corporal. By the time of trial, however, he had achieved the rank of sergeant.

*Blake Interview – August 27, 2019*

At trial, a redacted version of the Blake Interview was played and published to the jury over the objection of defense counsel.  The State explained that the recording was not "the full continuous interview[,]" because the State had excised the portions that it believed "wouldn't have been relevant[.]"  Defense counsel agreed that "[t]he stuff [the State] redacted was stuff that really legitimately, it just shouldn't come in because it just had nothing to do with this[,]" but maintained that he did not think "any of it is relevant[.]"[5]

As reflected in the redacted recording, on August 27, 2019—eighteen days after the raid—Sgt. Banks and Sgt. Bennett interviewed Mr. Blake at the house.  They began the conversation by telling Mr. Blake that they wanted to talk to him about "the case that you are involved in as a co-defendant[.]"  Mr. Blake was seated, wearing nothing except a blanket.  After his *Miranda* rights were read to him, Mr. Blake gave the officers his consent to speak verbally because he was unable to sign a statement.  Sgt. Bennett recorded the Blake Interview on his Bodycam.

At the very outset of the interview, Sgt. Bennett asked Mr. Blake, "So what's going on with Mont," referring to Appellant.[6]  Throughout the interview, the officers kept returning to questions about Appellant, and in total, the officers and Mr. Blake made

---

[5] A comparison of the redacted and unredacted versions of the Blake Interview demonstrates that the State excised nearly 28 pages of the original 69-page transcript that it deemed to be irrelevant to the present case.

[6] Throughout the interview, the officers and Mr. Blake refer to Appellant as "Lamont" or "Mont," and to Mr. Woods by his nickname, "Samere" or "Shamir."

approximately 88 references to "Mont" or "Lamont" on the redacted version of the Blake Interview offered by the State.

Mr. Blake asserted repeatedly that the drugs seized on the day of the raid belonged to Mr. Woods, aka "Shamir," and that Mr. Woods "leaves late at night" and "[b]rings it down"; whereas Appellant's "involvement" is that "[h]e just knows about it." Mr. Blake stated that "[a]t first" he worked for Appellant, but that Appellant "fell back because he's ready to start a family with his wife and get married."

The officers asked Mr. Blake about the operational details of the drug enterprise when he first got involved. Mr. Blake explained that during a period of "close to a year," Appellant supplied him with a cell phone and that his duties were to answer the phone, arrange deliveries, and drive to meetings where he exchanged the drugs for money. Appellant, who lived near Baltimore City, would visit Salisbury a few times each week, at which time Mr. Blake would give Appellant the proceeds from the drug sales, less expenses and his salary, and Appellant supplied Mr. Blake with new drugs, prepackaged for sale.

In recent months, however, Mr. Blake turned over the money to, and accepted new drugs from, Mr. Woods, rather than from Appellant. Then Mr. Woods "demoted" Mr. Blake to having almost no role in the enterprise because his health had deteriorated, and he was "too slow." Mr. Blake related that, during the last two months before the raid, Appellant would visit to "take care of [him]" and take him to the hospital for treatment, and that that was his only interaction with Appellant.

6

Although Mr. Blake was cooperative throughout the interview, at some points his answers were unintelligible, and his narrative confused, prompting the interviewing officers to say, "it doesn't make any sense[,]" or "your story makes no sense":

[SGT. BENNETT]: But how much did he give you at a time here to sell; is what I'm asking?

MR. BLAKE: Which one?

[SGT. BENNETT]: Lamont.

MR. BLAKE: Like 15.

[SGT. BENNETT]: So he came daily because you said you sold ten a day rough sometimes.

MR. BLAKE: No. He would -- when he come down on the weekends, that's when he would bring to me. But whenever the boy, Shamir, had, was already down here.

[SGT. BENNETT]: Was already stored here?

MR. BLAKE: I don't know where he had it at.

[SGT. BENNETT]: So it doesn't make any -- it doesn't make any sense.

MR. BLAKE: I told the dude it's over at 20 Pemberton (phonetic) somewhere but I don't know where.

[SGT. BENNETT]: So he would bring 15 -- it doesn't make any sense. Who -- so -- how does the organization work? Who's in charge?

MR. BLAKE: The boy, Shamir, has the stuff. Mont knows the people.

[SGT. BENNETT]: Okay.

MR. BLAKE: When he brings it down, he takes it to Pemberton but I don't know which --

7

[SGT. BENNETT]:  So Mont takes it to Pemberton?

MR. BLAKE:  No, the boy --

[SGT.] BANKS:  So Samir is his transportation?

MR. BLAKE: --  (indiscernible) -- he's claiming that he's -- Shamir has the stuff.

[SGT. BENNETT]: This whole conversation makes zero sense. I'm getting --

MR. BLAKE:  (Indiscernible) --

*     *     *

[SGT. BENNETT]:  I'm getting -- I'm getting a little bit frustrated.[7]

The ambiguity of Mr. Blake's responses was exacerbated by the officers' attempts to redirect him from events in the past to the present workings of the enterprise.  For example, as illustrated above, immediately after Mr. Blake recounted the salary he earned working for Appellant at the very beginning of the enterprise, one of the officers asked Mr. Blake to clarify "how does the organization work? Who's in charge?" to which Mr. Blake responded, "The boy, [Mr. Woods], has the stuff. Mont knows the people."  In another instance, Sgt. Banks redirected:

[SGT.]  BANKS:  Mont called the shots and then when you started your -- what  happened when your medical health went down? Who took over your spot when your health went down

---

[7] Directly after this colloquy, Sgt. Banks alluded to a prior conversation with Mr. Blake which occurred "the day of the search warrant" and expressed frustration that Mr. Blake's current narrative "is not close to what you told me."  At trial, defense counsel objected to this particular portion of the recording, arguing that this portion of the statement was not covered under the motions court ruling and was particularly prejudicial because counsel had not been provided with Mr. Blake's prior statement.  The State responded that "that statement is not material" and expressed that a curative instruction would be appropriate.  The court agreed and allowed the recording to proceed but instructed the jury to disregard that particular statement by Sgt. Banks.

8

south. When your health started getting bad? Who took your spot?

MR. BLAKE:	Shamir.

[SGT.] BANKS:	Okay.

MR. BLAKE:	I mean, he's the one that's been bringing down.

[SGT.] BANKS:	He's been transporting it for Mont down here.

MR. BLAKE:	Yeah.

[SGT.] BANKS:	Okay.

[SGT. BENNETT]: So Mont -- so what I'm asking is, Mont's still at the top.

MR. BLAKE:	No, he dropped out because he's getting ready to get married.

Mr. Blake then continued to clarify that, previously, Appellant "was top[,]" but "Samir took over" because Appellant was going to get married and "[s]o he said he wasn't going to do nothing else." Sgt. Bennett then asked:

[SGT. BENNETT]:	How long ago was that?

MR. BLAKE:	I was demoted.

[SGT. BENNETT]:	How long ago was that?

MR. BLAKE:	What? That Samir took over?

[SGT. BENNETT]:	Uh-huh.

MR. BLAKE:	The trip was like one (indiscernible) the plans for the trip. So it's been about two and half, three months. Just before this.

[SGT. BENNETT]:	Well, this was only – this was less than a month ago. This was only three weeks ago.

9

Sgt. Bennett continued to press Mr. Blake about Appellant's role in the enterprise, eventually narrowing his questions to the few weeks preceding the raid, during which the house was under surveillance, but Mr. Blake appeared unable to follow his thread:

[SGT. BENNETT]: Okay. But you know that Mont and Samir and you, up until a few weeks ago, all sold heroin, correct?

MR. BLAKE: No. I stopped.

[SGT. BENNETT]: Up until a few weeks ago, you all sold heroin, correct? So it shouldn't be that big of a surprise if there was heroin when a search warrant was done on Samir and Mont.

MR. BLAKE: No. What I'm saying is I didn't know it was here because Mont was saying he was leaving to go out of town.

[SGT. BENNETT]: I get that.

The State noted in its motion to admit the interview at trial: "At the conclusion of the interview, Mr. Blake suffered a health complication and was transported to the hospital in an ambulance."

### *Motion to Admit the Blake Interview*

On March 9, 2020, the State filed a motion to introduce the Blake Interview at trial premised upon Mr. Blake's unavailability due to his "failing health" and that "it would be infeasible to transport Mr. Blake to Court from his assisted care facility."[8] The State argued

---

[8] The State proffered at the September 14, 2020 motions hearing that Mr. Blake was staying at "a hospice care facility" at that time, and that he had "a number of very serious health conditions" including "congestive heart failure, acute kidney injury, sepsis, chronic kidney disease at stage three, acute respiratory failure with hypoxia and hypercapnia, anemia, leukocytosis, . . . a GI bleed at the time, and he suffers from type two diabetes."

that the Blake Interview should be admitted under Maryland Rule 5-804(b)(3), as a "statement against interest," because it "so tended to subject the declarant to civil or criminal liability, . . . that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." (quoting Md. Rule 5-804(b)(3)). The State further urged the court to admit the statement under the hearsay exception because "corroborating circumstances clearly indicate the trustworthiness of the statement," and extrinsic evidence supported "Mr. Blake's telling of events." It acknowledged that the court was obligated to "parse the whole of the statement into its individual, inculpating parts, and such other closely-related collateral statements," but claimed that "the statements that contain inculpating statements relating to Mr. Blake are so interwoven with the statements that inculpate [Appellant] that they cannot be severed." (citing *State v. Matusky*, 343 Md. 467 (1996)). The State pressed that the "collateral portions of the statement that are [] closely related to the inculpating excerpts" are "equally trustworthy" such that they were "correspondingly admissible" under Rule 5-804(b)(3).

Defense counsel filed a response challenging the sufficiency of the State's evidence that Mr. Blake's deteriorating health established his unavailability. Counsel also argued that the court should not admit the Blake Interview under two of the Maryland Rule 5-804(b) exceptions to the rule against hearsay. First, in arguing why the exception for prior testimony under Rule 5-804(b)(1) did not apply, counsel noted that, as required by the Rule, "[a]t no point has [the] defense had an opportunity to confront this witness and cross examine him as to the veracity of his statements." Second, in arguing against the admissibility of the Blake Interview under Rule 5-804(b)(3), counsel pointed out that the

11

statement was vague as to the relevant timeline of events and that he would not have an opportunity to show the jury that Mr. Blake was "lessening his involvement in an attempt of not getting charged in this case at the expense of the [Appellant]."

At the hearing convened on September 14, 2020, the court questioned whether the entire statement was against Mr. Blake's penal interest, observing "the issue here is the part of the statement -- I mean, part of the nuance here is the part of the statement that implicates the [Appellant], not the statement where, in effect, [Mr. Blake] implicates himself, correct?" The State agreed that "[t]here are definitely parts of the statement that are . . . solely against the [Appellant]'s interest," but in "a lot of portions of the interview [] the statement is against both their interests simultaneously and they are so interwoven that you couldn't possibly separate the two." The State invoked Justice Scalia's concurrence in *Williamson v. United States*, 512 U.S. 594 (1994) and noted that, as in that case, Mr. Blake was "describing the drug trafficking organization in excruciating detail. And when you are not the controller or the top level of the drug trafficking organization and you describe its inner workings you necessarily must inculpate other individuals and that is what occurred[.]"

The State asserted that "[t]he issue predominantly that Your Honor has to parse out is whether or not the statements are solely against [the] declarant's interest." In reference to *Williamson*, the State reminded the court, "[j]ust because you name somebody else for doing wrong doesn't, as Justice Scalia said, magically transform it into something that is not admissible."

The State listed examples of evidence it would submit at trial to corroborate the

12

statements in the Blake Interview, including, that: (1) an "undercover officer did four controlled buys" with Mr. Woods, one of which was allegedly arranged by a person identifying himself as "Mont," thereby corroborating Mr. Blake's assertion that although Mr. Woods had taken over operations, Appellant was still involved; (2) Mr. Woods stated that he traveled out of town to obtain more narcotics, which "corroborate[d] what Mr. Blake said" about Mr. Woods being the one to bring the drugs down; and (3) "[t]he car utilized to conduct the undercover buys of controlled dangerous substance belong[ed] to Mr. Blake," consistent with his statement that Mr. Woods used his car to complete the drug transactions.

Defense counsel challenged the State's assertion that Mr. Blake's statements in the Blake Interview were self-inculpatory and attacked the overall trustworthiness of the Blake Interview on the premise that it was so "ambiguous" and "confusing" as to not be probative. Defense counsel noted that the events described in the Blake Interview were not connected to a "timeframe," but described a progression in which "Mr. Woods took over the drug organization from [Appellant]. That [Appellant] got out of the business when he got engaged. That he's no longer doing it[.]" He argued that cross-examination of Mr. Blake would be necessary to untangle the timeline connecting Mr. Blake's statements, particularly regarding when Appellant withdrew from the distribution scheme, noting "I have no concept of if that happened a week before, if that happened three months before, if that happened a year before . . . If I had the ability to cross-examine that witness we

might very well find out what happened a year ago[.]"[9]

The court asked defense counsel whether he considered the overall effect of the Blake Interview to be exculpatory of Appellant. Counsel admitted, "I spent a lot of time going back and forth as to whether I should just allow this in," but explained that overall, the interview was problematic because of, among other things, the confusing timeframes.

After hearing these arguments, the court granted the motion and permitted the State to introduce the Blake Interview at trial. The trial court first found that Mr. Blake's health condition rendered him unavailable for trial, and then acknowledged that the "bigger question is whether under 5-804(b)(3) his statement should be admissible at trial." The court explained:

> I don't question whether or not his statement is a statement against interest, I also don't necessarily question the reliability of it. I do think the sort of interesting segue obviously is whether or not that statement that then ties in [Appellant] should be admissible at his trial. . . . I have looked, I know my law clerk has looked, I think the State and [defense counsel] have looked to find a Maryland case on point and I don't think any of us have been successful. [The State] cited to the Williamson case, which I have not reviewed for this case but I have reviewed previously. The Court would note that Justice Scalia's concurrence does seem to be on point. So the Court is going to grant the State's request to allow the statement to be heard.

---

[9] At the first motions hearing on August 7, 2020, defense counsel expressed a similar concern regarding the reliability of the Blake Interview due to its confusing timeline:
> . . . well, the case against my client is a kingpin charge and a search of a house where they find drugs where he's present. . . . And he's charged with [being a] kingpin over like a two month period; . . . [A]t no point in [] the statement does [Mr. Blake] give concrete timeframes for any of this stuff. . . . it is extremely confusing what he's actually talking about as far as timeframe. . . So without the ability to cross-examine him and hammer this stuff down I'll have no ability – a jury will just hear that he was a drug kingpin at some point in his life, . . . with no concrete timeframe.

At trial, the State entered into evidence, and played for the jury, the redacted version of the Blake Interview described above. Because admission of the Blake Interview is the central issue in this appeal, we review other evidence presented at trial in summary fashion.

The State called seven witnesses, starting with Detective Mike Kirkland of the Ocean City Police Department Narcotics Unit, who had investigated the "drug-trafficking organization" undercover for the Worcester County Criminal Enforcement Team. Det. Kirkland testified that he made four controlled purchases of heroin from Mr. Woods.

In the first instance, on July 24, 2019, Det. Kirkland said he initiated the sale by calling a telephone number and arranging the deal with Mr. Blake and Mr. Woods. The purchase was completed in the bathroom of a local grocery store. In the second instance, Det. Kirkland called the same telephone number, whereupon a person who identified himself as "Mont" answered and instructed the detective to use a new number to contact Mr. Woods. Det. Kirkland called the other number and set up the next purchase from Mr. Woods inside Det. Kirkland's car at a nearby gas station. In the third and fourth instances, Det. Kirkland arranged the purchases through Mr. Woods.

The State's second witness, Sgt. Bennett, who had conducted the investigation into the drug operation, identified the targets of his investigation as Mr. Blake, Appellant, and Mr. Woods. He testified about the circumstances of the August 27 interview of Mr. Blake that he conducted with Sgt. Banks. Defense counsel noted a standing objection to Sgt. Bennett's testimony about the content of the interview and objected again when the State introduced the Blake Interview into evidence.

Sergeant Burley Williams testified next about his involvement in surveillance of the enterprise and corroborated earlier testimony by Det. Kirkland regarding the controlled purchases from Mr. Woods. Sgt. Williams also established the chain of custody of the narcotics obtained on July 31, 2019, explaining that he packaged and sealed the suspected heroin obtained by Det. Kirkland to be sent for laboratory analysis.

On the second day of the trial, the State called a fifth officer, Detective Andrew Riggin, who testified that he had obtained the search and seizure warrant and then conducted the raid on the house. He gave detailed testimony about the events of the raid, the configuration of the house, and the items seized.

Jessica Bullis, a forensic chemist, testified next and identified the CDS purchased by Det. Kirkland from Mr. Woods which included heroin and fentanyl. She also identified the CDS seized in the August 9 raid, which included heroin, fentanyl, cocaine, and alprazolam.

The State's final witness, Special Investigator Michael Daugherty—an expert in drug valuation, identification, and trade practices—testified to the street value of the seized evidence and to the organizational structure of drug enterprises. At the close of the State's case, Appellant moved for judgment of acquittal. The motion was granted as to Counts 6 (conspiracy to distribute fentanyl), 21 (possession of more than 28 grams of heroin), 22 (possession of more than 5 grams of fentanyl), 23 (conspiracy to possess more than 28 grams of heroin), 24 (conspiracy to possess more than 5 grams of fentanyl), and 25 (conspiracy to possess more than 28 grams of heroin) but was denied as to the remainder.

Appellant testified in his own defense. He explained that he and Mr. Blake had been

friendly for a long time and that he was taking Mr. Blake to all of his medical appointments because "he was dying." He admitted that he had previously dealt heroin and had been convicted for distribution in the past. Appellant claimed that he only knew Mr. Woods through Mr. Blake and was aware that he was selling drugs. Appellant adamantly maintained that he was not involved in selling narcotics with Mr. Woods. He claimed that he was merely staying at the house on the night of the raid to check in on Mr. Blake before going to pick up his mother-in-law for a family trip. Appellant denied that any of the drugs or ammunition found in the house that night belonged to him and explained that he received mail at that address because his car insurance was registered there. On cross-examination, Appellant claimed that the Blake Interview was unreliable because Mr. Blake wasn't in his right mind and the officers were "tortur[ing]" a dying man.

The defense then rested its case and moved again for a judgment of acquittal, arguing that the State had not proved a necessary element of the Drug Kingpin charges against Appellant—namely, the requisite amount of heroin and fentanyl. The court granted the motion as to Count 12—possession with intent to distribute alprazolam—and denied the motion as to the remaining counts.

The jury found Appellant guilty on twelve counts: all four counts of Possession of CDS other than Marijuana (Nos. 30-33); and all eight counts of Conspiracy for Possession of CDS other than Marijuana (Nos. 34-41). Appellant was either acquitted by the court or found not guilty by the jury of the remaining 30 counts.

### Sentencing Hearing – May 27, 2022

At sentencing, the court imposed four one-year sentences for the four counts of

17

possession of a CDS (Nos. 30-33) to be served consecutively. The court also, after merging the eight conspiracy convictions into four, imposed one-year sentences for each to be served concurrently with the four-year sentence on the possession convictions for an aggregate of four years' imprisonment. The court granted Appellant credit for time served since his arrest in the raid on August 9, 2019.

## DISCUSSION

## I.

## Admission of an Inculpatory Statement by an Unavailable Declarant

## A. Constitutional Claim

Before this Court, Appellant argues that the trial court's admission of the Blake Interview violated his right to confront his accuser under the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights because the interview contained testimonial statements by Mr. Blake, who was unavailable for cross-examination. The State argues that Appellant did not preserve the issue for appeal.

Appellant, in response, contends that the issue was preserved because, although defense counsel did not specifically mention the Confrontation Clause, on several occasions defense counsel complained of "his inability to 'cross-examine' Mr. Blake[,]" —a concept that Appellant contends "is synonymous with the right of a criminal defendant to confront witnesses testifying against him[.]" Appellant emphasizes that even the State, at the motions hearing, understood defense counsel's argument as "mak[ing] an equitable argument saying it's not fair, you know, the confrontation clause reigns supreme[.]" We agree with the State that Appellant's Confrontation Clause claim was not preserved.

18

The record establishes that, although defense counsel referenced his inability to cross-examine Mr. Blake on several occasions during the course of his arguments against admission of the Blake Interview, in context, those statements were clearly contained within counsel's arguments against admissibility *under the Rule*. For example, in contending that the Blake Interview was not sufficiently trustworthy to be admitted under the Rule, counsel bemoaned the lack of an established timeframe by Mr. Blake and explained that "it is extremely confusing what he is talking about as far as timeframe . . . [s]o without the ability to cross-examine him and hammer this stuff down, I'll have no ability – a jury will just hear that he was a drug kingpin at some point in his life and that worries me[.]" In another instance, counsel noted that "I have no concept of if [Appellant's supposed withdrawal from the enterprise] happened a week before, if that happened three months before, if that happened a year before . . . If I had the ability to cross-examine that witness we might very well find out what happened a year ago[.]" In other words, counsel was arguing for exclusion of the Blake Interview in its entirety, but under the logical thread that the statement was so vague and uncertain as to make it unreliable, as demonstrated by the fact that cross-examination would have been necessary to clear up the gaps in the Interview. In fact, defense counsel evinced that understanding from the very beginning, as he had directly conceded in Appellant's response to the State's motion to admit the Blake Interview that "[t]his issue is controlled by Maryland Rule 5-804[.]"[10]

---

[10] At oral argument before this Court, Appellant's counsel pointed to language contained within Appellant's response to the State's motion stating that "[a]t no point has [the] defense had the opportunity to confront this witness and cross examine him." Yet,

(Continued)

Of course, as Appellant notes, it is true that "preservation of a constitutional objection premised on the violation of a specific constitutional provision" does not require "that constitutional provision to be specifically mentioned as the basis for the objection." *Bhagwat v. State*, 338 Md. 263, 281 (1995). Yet, we consider equally plain the premise that any such objection must be sufficiently definite as to fairly alert the trial court to the nature of the issue that it is being called upon to correct. *See Ray v. State*, 435 Md. 1, 23 (2013) (noting that Maryland Rule 8-131(a) works to ensure that "'(1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge are given an opportunity to consider and respond to the challenge.'" (quoting *Chaney v. State*, 397 Md. 460, 468 (2007)). We do not agree that simply protesting the lack of ability to cross-examine is necessarily sufficient to raise a confrontation claim. For example, although the right to cross-examine adverse witnesses is at the heart of the Confrontation Clause, the scope of the confrontation right only extends to *testimonial* hearsay. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Even if a criminal defendant is denied the opportunity to cross-examine an unavailable declarant, the Confrontation Clause simply has no application when the declarant's statements were non-testimonial in nature.

---

when we examine the response that was filed, we see that context is crucial. Defense counsel's statement was contained within his argument as to why the prior testimony exception to the hearsay rule, codified in Maryland Rule 5-804**(b)(1)**, did not apply to the present situation. Defense counsel also pointed out that "the [Blake Interview] is not former testimony, it is a statement made by the witness in his house being questioned and at times being yelled at by the police." As with counsel's other protestations regarding cross-examination, the statement was a component of counsel's arguments about why the Blake Interview was not admissible under the Maryland Rules—it was not part of a separate argument raising a constitutional claim.

Before the trial court, in the course of arguing that the inability to cross-examine Mr. Blake was unfair to Appellant, defense counsel did not mention the Sixth Amendment, Article 21, or *Crawford*. Nor did he undertake to explain why Mr. Blake's statements were testimonial and why the "'primary purpose'" of the interview was to "'establish or prove past events potentially relevant to later criminal prosecution.'" *Michigan v. Bryant*, 562 U.S. 344, 356 (2013) (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)). Rather, as noted previously, counsel's allusions to the inability to cross-examine were entirely subsumed within his broader arguments regarding the trustworthiness of the Blake Interview under Maryland Rule 5-804(b)(3). Although, at the motions hearing the State briefly referred to defense counsel's "equitable argument saying it's not fair, the confrontation clause reigns supreme," in context, that statement was part of the State's overarching argument that defense counsel was "straying into other arguments" not actually before the court—specifically, "arguments that go to the weight of the testimony, not their reliability" *under the Rule*. The trial court, in turn, proceeded to rule solely on the admissibility of the Blake Interview under Rule 5-804(b)(3) and never once mentioned the Confrontation Clause.

Under these circumstances, we agree with the State that Appellant never fairly apprised the trial court that he was objecting to the admission of the Blake Interview as a violation of his constitutional right to confront the witnesses against him. Appellant certainly objected on the ground that Rule 5-804(b)(3) was inapplicable, but as we have previously explained, though the Confrontation Clause and Rule 5-804(b)(3) are interrelated, "it is well-settled that the two grounds are not synonymous or coextensive;

21

thus objecting on one ground does not preserve the other ground." *Collins v. State*, 164 Md. App. 582, 605-06 (2005).

Although we resolve this case on non-constitutional grounds, we shall utilize our discretion pursuant to Maryland Rule 8-131(a) to briefly dispel any misconceptions that the admissibility of a hearsay statement against penal interest is governed by Rule 5-804(b)(3) in any way to the exclusion of the Confrontation Clause and Article 21 of the Maryland Constitution's Declaration of Rights.[11] As we shall explain in more detail *infra*, prior to the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), the analysis of a Confrontation Clause claim and certain exceptions to the admission of hearsay under the Maryland Rules were much more intertwined as the ultimate focus under each was on the proffered statement's reliability. *See Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980) *overruled by Crawford v. Washington*, 541 U.S. 36, 68 (2004); *West v. State,* 124 Md. App. 147, 166-67 (1998); *see also Gray v. State*, 368 Md. 529, 566-67, 574-75 & n.4 (2002) (Raker, J., concurring) (explaining that "it is important to keep in mind that the standards for admissibility under the Confrontation Clause are stricter than under the hearsay exception, requiring independent corroboration, while the hearsay exception under the rule does not.").

---

[11] The apparent confusion is demonstrated, for example, by the State's comments at the motions hearing regarding the interplay between the Confrontation Clause and Rule 5-804(b)(3)—specifically, the suggestion that "the confrontation clause reigns supreme" was not apposite because that was "straying into other arguments . . . that go to the weight of the testimony, not their reliability."

To be clear, reliability is no longer the touchstone of the analysis under the Confrontation Clause.[12] Pursuant to *Crawford* and its progeny, a statement that is testimonial—*i.e.*, that was taken for purposes of proving "'past events potentially relevant to later criminal prosecution[,]'" *Bryant*, 562 U.S. at 356 (quoting *Davis*, 547 U.S. at 822)—no matter how internally or externally reliable, is inadmissible when there has been no prior opportunity to cross-examine the witness. Accordingly, although admissibility under both the Confrontation Clause and the hearsay exception is pre-conditioned on a showing of unavailability, a statement that is admissible under Rule 5-804(b)(3) might not be admissible under the Confrontation Clause, and *vice versa*. The required analyses under each are separate and distinct, *Collins v. State*, 164 Md. App. at 605-06, and a claim under one body of law does not preclude a claim under the other. In other words, even when admissibility of a co-defendant's statement against interest has been resolved in favor of

---

[12] The same is true with respect to a claim brought under Article 21 of the Maryland Declaration of Rights, in that the Supreme Court of Maryland (then, the Court of Appeals) explained in *State v. Snowden*, that "Article 21 of the Maryland Declaration of Rights . . . is Maryland's counterpart to the Confrontation Clause and . . . [t]his Court often has construed the Confrontation Clause and Article 21 . . . to be in *pari materia*." *State v. Snowden*, 385 Md. 64, 74 n.9 (2005). Although we have not identified a case that highlights a distinction between the Confrontation Clause and Article 21 that is applicable here, we note that in a different context, our Supreme Court, in applying Article 21, departed from following the fractured decision in *Williams v. Illinois*, 567 U.S. 50 (2015). In *Leidig v. State*, due to the difficulties of applying the decision in *Williams*, our Supreme Court held that whether a scientific report prepared in advance of trial is testimonial under Article 21 is governed by the "primary purpose" test set out in *Davis v. Washington*, 547 U.S. 813 (2006), not by the "formality requirement" set forth in Justice Thomas's concurrence in *Williams* (which has been determined to be the controlling *Marks* opinion). *Leidig v. State*, 475 Md. 181, 234-46 (2021).

the State under Rule 5-804(b)(3), the Confrontation Clause can pose a separate bar to admissibility so long as the defendant clearly raises it before the trial court.

## B. Statement Against Interest Under Maryland Rule 5-804(b)(3).

### 1. *The Legal Framework Governing Admission of a Statement Against Penal Interest*

We begin with a summary of the law governing the dispositive issue in this appeal in order to place the parties' contentions, and our analysis, in proper context.

Maryland Rule 5-801 defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"; and Rule 5-802 provides that hearsay is generally not admissible, "except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes[.]" One class of exceptions to the rule against hearsay is delineated under Maryland Rule 5-804 and permits the admission of certain types of hearsay evidence when the declarant is unavailable. "Unavailability as a witness" includes when a witness is "unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity." Md. Rule 5-804(a)(4).

Within this category of exceptions for statements made by an unavailable declarant is a statement against interest—that is:

> [a] statement which was at the time of its making so contrary to the declarant's pecuniary or proprietary interest, so tended to subject the declarant to civil or criminal liability, or so tended to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Md. Rule 5-804(b)(3). "'The underlying theory of this exception is that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true.'" *Jackson v. State*, 207 Md. App. 336, 348, *cert. denied* 429 Md. 530 (2012) (quoting *State v. Standifur*, 310 Md. 3, 11 (1987)) (cleaned up). The corroboration requirement contained in Rule 5-804(b)(3) "'serves to deter criminal accomplices from fabricating evidence at trial.'" *Stewart v. State*, 151 Md. App. 425, 447 (2003) (quoting *Roebuck v. State,* 148 Md. App., 563, 580 (2002). We have observed that "there is no litmus test that courts must follow to establish adequate corroboration or trustworthiness." *Roebuck,* 148 Md. App. at 580.

Therefore, as a general matter, when evaluating the admissibility of a statement offered in evidence as a statement against penal interest, the trial court must determine that "'1) the declarant's statement was against his or her penal interest; 2) the declarant is an unavailable witness; and 3) corroborating circumstances exist to establish the trustworthiness of the statement.'" *Jackson*, 207 Md. App. at 336 (quoting *Roebuck*, 148 Md. App. at 578). More specifically, in determining whether the proffered statement is sufficiently self-inculpatory to qualify under the exception, the court should consider the "content of the statement in light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant," and "determine whether the statement was in fact against the declarant's penal interest and whether a reasonable person in the situation of the declarant would have perceived that it was against his penal interest at the time it was made." *Standifur*, 310 Md. at 17. Finally,

25

after determining that the statement as a whole is averse to the declarant's penal interest, the court must parse through the statement "'and determine the separate admissibility of each single declaration or remark'" in the larger narrative. *State v. Matusky*, 343 Md. 467, 492 (1996) (quoting *State v. Mason*, 460 S.E.2d 36,45 (W. Va. 1995)) (cleaned up).

## 2. *The Corroboration Requirement*

As previously noted, Maryland Rule 5-804(b)(3) instructs that a statement "tending to expose the declarant to criminal liability and offered in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." Md. Rule 5-804(b)(3). Before 2011, the prior version of Maryland Rule 5-804(b)(3) only required a showing of corroborating circumstances where the statement was offered to *exculpate* the accused—*i.e.*, by showing that the declarant, instead, committed the charged offense. *See, e.g.*, *Roebuck v. State*, 148 Md. App. 563, 578 (2002) (quoting prior version of Rule 5-804(b)(3)). The origins of the current corroboration requirement developed along two distinct lines of cases prior to amendment of Rule 5-804(b)(3) in 2011 to also require corroborating circumstances when a statement is offered to *inculpate* the accused.

First, in those cases in which the statement was being offered by the defense, the defendant was permitted wide latitude to elucidate corroborating evidence at trial to permit admission of an exculpatory statement. For example, in *Gray v. State*, the defendant was accused of murdering his wife, and he sought to introduce an out-of-court statement by the alternative suspect, his wife's lover, who was unavailable by invocation of the Fifth Amendment. 368 Md. 529, 533-35 (2002). The wife's lover had made a statement to the relator witness that he was in an intimate relationship with the victim, and that he had

26

murdered her with a gun and a knife, which he displayed to the relator witness. *Id.* at 535-36. The trial court excluded the testimony from the relator witness, finding the evidence lacked sufficient corroboration. *Id.* at 536-37. The Maryland Supreme Court reversed, pointing to "other evidence" that "was also proffered to corroborate [the relator witness's] testimony about [the declarant]'s statements against interest[,]" including, *inter alia*: 1) evidence that the declarant was involved with the victim in a love triangle; 2) testimony that the declarant had been in possession of jewelry similar to that worn by the victim, coupled with evidence that the victim's body was missing the jewelry and also missing five fingers; 3) evidence showing that the victim was killed by three gunshots to the head by a .22 caliber gun and was also stabbed; 4) testimony corroborating the declarant's presence in the relator witness's home, when some of the statements were allegedly made within the hearing of the relator witness and her husband; and 5) testimony that the declarant was a confidante of the relator witness's husband. *Id.* at 546–47.

In both *Stewart v. State*, 151 Md. App. 425 (2003) and *Roebuck v. State*, 148 Md. App. 563 (2002), the trial court's admission of statements against penal interest that were exculpatory of the accused were challenged because they tended to inculpate the declarants as the perpetrators. In these cases, we surveyed Maryland decisional law to collect the following examples of other corroborating factors to be considered:

(1) "that a reasonable person in the situation of the declarant would have perceived the statement as disserving at the time he made it," *Stewart*, 151 Md. App. at 448 (quoting *Standifur*, 310 Md. at 13 (1987));

(2) the consistency of a declarant's statement, because "repeated changes in the declarant's story . . . would properly make any court suspicious of the statement's reliability," *Id.* at 455 (quoting *United States v. Bahadar*, 954

27

F.2d 821, 829 (2d Cir. 1992) (cleaned up));

(3) the timing of the statement, because "[w]hen a statement against interest is made soon after the event in issue, that factor generally weighs in favor of trustworthiness[,]" *Roebuck,* 148 Md. App at 583-84 (citing *United States v. Camacho*, 163 F. Supp. 2d 287, 306 (S.D.N.Y. 2001)); and

(4) the spontaneity of the statement, as "courts tend to regard as reliable those statements that are made spontaneously, rather than 'in response to coercive questioning by police officers[,]'" *Id.* at 584 (quoting *Camacho*, 163 F. Supp. 2d at 306).

In the second line of cases, although the prior version of Rule 5-804(b)(3) did not require a showing of reliability where the statement was *inculpatory* of the accused, Maryland Courts required a showing of reliability under the Sixth Amendment's Confrontation Clause as it was then applied. At the time, under the operative standard set by *Ohio v. Roberts,* 448 U.S. 56, 66 (1980),[13] the proponent of the statement (*i.e.*, the State) was required to demonstrate that the statement was "cloaked with indicia of reliability . . . [which] means that there must be a showing of particularized guarantees of trustworthiness." *Wilkerson v. State*, 139 Md. App. 557, 576 (2001) (quoting *West v. State,* 124 Md. App. 147, 167 (1998)). In several cases, we seemed to suggest that the analyses

---

[13] *Roberts* created a two-part test pursuant to which the proponent of the statement was required to show (1) the necessity of introducing the out-of-court statement due to the declarant's unavailability, and (2) the statement was reliable either because it fell within a "firmly rooted hearsay exception" or it bore "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980) *overruled by Crawford v. Washington*, 541 U.S. 36, 68 (2004). In 2004, the United States Supreme Court disentangled these doctrines in *Crawford v. Washington*, 541 U.S. 36 (2004), overruling *Roberts* and clarifying that the Confrontation Clause—regardless of the applicability of any firmly rooted hearsay exception or particularized guarantees of trustworthiness—bars the admission of testimonial hearsay from an unavailable declarant unless the defendant has had a prior opportunity to cross-examine. *Id.* at 68.

under Rule 5-804(b)(3)'s corroboration requirement (for exculpatory statements) and the Confrontation Clause's mandate of "particularized guarantees of trustworthiness" were one and the same. *See, e.g.*, *West*, 124 Md. App. at 167 (implicitly suggesting a melding of the two doctrines); *Wilkerson*, 139 Md. App. at 576 (same); *Roebuck*, 148 Md. App. at 579 (same); *but see Gray v. State*, 368 Md. 529, 566-67, 574-75 & n.4 (2002) (Raker, J., concurring) (warning of the danger of conflating the two doctrines and emphasizing "it is important to keep in mind that the standards for admissibility under the Confrontation Clause are stricter than under the hearsay exception, requiring independent corroboration, while the hearsay exception under the rule does not.").

Indeed, as alluded to by Judge Raker in *Gray*, the Supreme Court of Maryland[14] had explained in *Simmons v. State*, that although "courts have considerable leeway in their consideration of appropriate factors to determine the existence of particularized guarantees of trustworthiness . . . [o]ne of the factors which a court may not consider, however, is other corroborative evidence" when determining reliability under *Roberts*. 333 Md. 547, 560 (1994) (citation omitted). Instead, "the inherent reliability of the statement is to be measured by those circumstances 'that surround the making of the statement and that render the declarant particularly worthy of belief[,]'" *not* "by reference to other evidence at trial." *Id.* at 560-61 (quoting *Idaho v. Wright*, 497 U.S. 805, 819, 822 (1990)). The *Simmons* decision exemplified this earlier approach in its consideration of factors relevant

---

[14] During the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

to determine the reliability of the inculpatory statement against penal interest, including (1) "the 'age, education, experience and condition of the declarant'"; (2) the "statement's spontaneity"; and (3) the motive of the declarant, *i.e.,* whether the declarant "desire[d] to mitigate his own involvement or to overstate the involvement of the person he implicated[.]" *Id.* at 562-63 (quoting *Standifur*, 310 Md. at 12).

After *Crawford* jettisoned the *Roberts* test, the need to examine the "particularized guarantees of trustworthiness" of a statement against interest offered against the accused in a criminal case fell away as a matter of Confrontation Clause jurisprudence.[15] Accordingly, as the law stood post-*Crawford*, between 2004 and 2011, corroboration of a statement offered as a statement against interest was only required when the statement was offered to exculpate the defendant. In 2011, as we have noted, the Rules Committee addressed this gap, removing the phrase "to exculpate the accused" and replacing it with "in a criminal case[.]" 165th REPORT OF THE STANDING COMMITTEE ON RULES OF PRACTICE AND PROCEDURE at 22-25 (Aug. 24, 2011). A Reporter's Note indicated the logic underlying the change:

> The Rules Committee recommends a change to Rule 5-804 (b)(3). This was requested by the Office of the Public Defender, and it is based on an amendment to Fed. R. Ev. 804 (b)(3) that will go into effect December 2010. The proposed amendment would require both sides in a criminal case to show corroborating circumstances as a condition for admission . . . Currently, the Rule requires only the defendant to make this showing. The

---

[15] Of course, the statement would still have to satisfy the formulation laid out in *Crawford* to survive Confrontation Clause scrutiny, perhaps by being non-testimonial or there having been a prior opportunity to cross-examine the witness. *See State v. Raine*, 238 So.3d 1076, 1085-86 (La. App. 2018) (upholding admission of statement against interest of co-defendant because statements were made to family members and a cellmate and thus were not testimonial).

Office of the Public Defender points out that under the current Rule, there is a risk of wrongful convictions based on unreliable statements against interest by unavailable witnesses who cannot be cross-examined. Unavailable State's witnesses' testimony should be subject to the same requirement of corroboration as that of defense witnesses. *Id.* at 25.

Accordingly, it is now clear that a showing of trustworthiness is required *under the Rule* regardless of whether it is inculpatory or exculpatory or by whom it is offered. Moreover, because *Roberts* and its progeny no longer inform that analysis, the State is simply subject to "the same requirement of corroboration" and may provide corroborating circumstances from other evidence adduced at trial, as has been the traditional practice in evaluating corroborating circumstances under Rule 5-804(b)(3) as applied to exculpatory statements offered by the defendant. *Gray v. State*, 368 Md. 529, 546–47 (2002); *Stewart v. State*, 151 Md. App. 425, 454-56 (2003); *Roebuck v. State*, 148 Md. App. 563, 592-94 (2002). That does not mean, however, that these two classes of statements are entirely equivalent in their presumptive reliability, as the Supreme Court of Maryland has made clear in the past that:

> [W]e must treat as "inevitably suspect" a statement made to persons in authority and implicating a codefendant, even though the statement also contains an admission of the declarant's culpability . . . A defendant implicating his confederate may do so to curry favor with the authorities, to achieve a plea bargain, to shift the blame by showing that another was more culpable, or simply to have another with whom to share the blame.

*State v. Standifur*, 310 Md. 3, 13 (1987) (quoting *Cruz v. New York*, 481 U.S. 186, 190 (1987)) (other citations omitted).

### 3. *Parsing Requirement*

In *State v. Standifur*, decided prior to the adoption of Title 5 of the Maryland Rules, the Supreme Court of Maryland first addressed the necessity of disaggregating the constituent parts of a larger self-inculpatory narrative. 310 Md. 3 (1987). In that case, a declarant-witness who had illegally purchased a gun used in a burglary gave a statement to law enforcement explaining how he came into possession of the weapon. *Id.* at 6-7. At trial, the declarant-witness was unavailable and the State Trooper who took that person's statements was permitted to relate them as declarations against the declarant-witness's penal interest. *Id.* at 8. We reversed and the Supreme Court of Maryland affirmed our decision. *Id.* at 9, 20. After discussing the rationale of the statement against interest exception to the hearsay rule, the Court explained that "[i]nculpatory statements may be divided into collateral and noncollateral statements." *Id.* at 15. Noncollateral statements were those "in which the facts inculpating the defendant are found in the portion of the statement directly against the declarant's interest." *Id.* at 15-16. Collateral statements, by contrast, were those in which "the inculpatory material is not found in the portion of the statement directly against the declarant's interest, but instead appears in another portion of the statement." *Id.* at 16.

The Court outlined the process for analyzing the admissibility of a hearsay statement offered as a declaration against penal interest. *Id.* at 17. We summarize the analytical steps set out by the *Standifur* Court as follows:

(1) *Unavailability*. The trial court must find that the declarant is unavailable to testify at trial.

32

(2) *Penal Interest/Nature of the Statement as Whole*.  The trial court—considering "the content of the statement in the light of all known and relevant circumstances surrounding the making of the statement and all relevant information concerning the declarant"—must "determine whether the statement was in fact against the declarant's penal interest and whether a reasonable person in the situation of the declarant would have perceived that it was against his penal interest at the time it was made."

(3) *Reliability*.  The trial court must then "consider whether there are present any other facts or circumstances, including those indicating a motive to falsify on the part of the declarant, that so cut against the presumption of reliability normally attending a declaration against interest that the statements should not be admitted."

(4) *Final Inquiry/Parsing*.  Finally, "a statement against interest that survives this analysis, *and those related statements so closely connected with it as to be equally trustworthy*, are admissible as declarations against interest."[16]

*Standifur*, 310 Md. at 12, 17 (emphasis added); *see also State v. Matusky*, 343 Md. 467, 479-82 (1996) (discussing the test set forth in *Standifur* and breaking it into separate "requirements for admissibility" culminating with the "final inquiry" in which the "trial judge [must] parse the entire declaration to determine which portions of it are directly contrary to the declarant's penal interest, and which collateral portions are so closely related as to be equally trustworthy.").  Applying that framework, the Court concluded that the declarant-witness's statement should not have been admitted because the evidence was insufficient to prove that a reasonable person in his position "would have understood the

---

[16] As we explain *infra*, the Supreme Court of Maryland would modify the analysis on this final step by adopting the *Williamson* framework and clarifying that "'proximity' between the self-inculpatory and 'collateral' portions no longer guarantees admissibility." *State v. Matusky*, 343 Md. 467, 491 (1996).  Instead, even as to collateral statements, "[t]he test for admissibility to be applied to each statement within a declaration is whether a reasonable person in the declarant's circumstances would have believed the statement was adverse to his or her penal interest at the time it was made." *Id.* at 492.

33

disserving nature of the statement" and "the totality of the circumstances under which the statement was made militate[d] against a finding of the requisite reliability." *Id.*

A few years later, in *Williamson v. United States*, the United States Supreme Court confronted the admissibility of a co-defendant's partially inculpatory statement under FED. R. EVID. 804(b)(3). 512 U.S. 594 (1994). There, the declarant, Harris, was discovered with a large quantity of cocaine in the trunk of his rental car and was taken into custody. *Id.* at 596. During his interview with officers from the Drug Enforcement Administration, Harris indicated that the seized cocaine belonged to Williamson and that Harris was simply acting as a courier. *Id.* at 596-97. Williamson was eventually charged with various drug offenses and Harris refused to testify at trial. *Id.* at 597. Nevertheless, the trial court permitted the DEA agent who interviewed Harris to relate his statements, concluding that they qualified as statements against interest under FED. R. EVID. 804(b)(3). *Id.* at 597-98. The United States Court of Appeals for the Eleventh Circuit affirmed, but the Supreme Court reversed, concluding that the statements were not properly admitted. *Id.* at 598, 604.

The Court reasoned that "the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." *Williamson*, 512 U.S. at 600-01. The Court emphasized that there was "no reason why collateral statements, even ones that are neutral as to interest . . . should be treated any differently from other hearsay statements that are generally excluded" and the only consideration is whether each statement in the broader narrative is itself against the declarant's interest. *Id.* at 600-01. The Court recognized that "the confessions of arrested accomplices may be admissible if they are

34

truly self-inculpatory, rather than merely attempts to shift blame or curry favor" when viewed in context. *Id.* at 603. As applied to Williamson's case, though, the Court noted that while portions of Harris's confession were self-inculpatory, other parts, "especially the parts that implicated Williamson, did little to subject Harris himself to criminal liability" and therefore could not qualify under the exception. *Id.* at 604. Because the lower courts never "inquired whether each of the statements in Harris' confession was truly self-inculpatory[,]" the Court remanded the case "to the Court of Appeals to conduct this inquiry in the first instance." *Id.*

Justice Scalia concurred and wrote to expound his view that the statement against interest exception may properly cover statements which inculpate both the declarant and a co-conspirator. *Williamson*, 512 U.S. at 605-07 (Scalia, J., concurring). In an influential passage, Justice Scalia explained that:

> . . . a declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible merely because the declarant names another person or implicates a possible codefendant. For example, if a lieutenant in an organized crime operation described the inner workings of an extortion and protection racket, naming some of the other actors and thereby inculpating himself on racketeering and/or conspiracy charges, I have no doubt that some of those remarks could be admitted as statements against penal interest. Of course, naming another person, if done, for example, in a context where the declarant is minimizing culpability or criminal exposure, can bear on whether the statement meets the Rule 804(b)(3) standard. The relevant inquiry, however—and one that is not furthered by clouding the waters with manufactured categories such as "collateral neutral" and "collateral self-serving," . . . must always be whether the particular remark at issue (and *not* the extended narrative) meets the standard set forth in the Rule. *Id.* at 606-07 (Scalia, J., concurring).

Following *Williamson*, in *Matusky*, the Supreme Court of Maryland returned to the issue of parsing. 343 Md. 467 (1996). There, the respondent was charged with two counts

of first-degree murder. *Id.* at 470. The respondent's co-defendant (and alibi witness), White, had previously admitted to his fiancée that he had been present when the respondent committed the murder and that he abetted the crime. *Id.* at 471, 473. At trial, the co-defendant invoked his Fifth Amendment privilege and was, therefore, unavailable to testify. *Id.* at 472. The State, however, called the fiancée to testify as to what the co-defendant told her, identifying the respondent as the killer and the co-defendant as the getaway driver. *Id.* at 472-73. The court permitted the fiancée to testify under the statement against penal interest exception. *Id.* at 471-72. This Court reversed, reasoning that the trial court should not have admitted the co-defendant's statement in its entirety because portions of the statement were not self-inculpatory, especially those which identified the respondent as the killer and discussed his motive. *Id.* at 475-76 (citing *Matusky v. State*, 105 Md. App. 389 (1995)). The Supreme Court of Maryland agreed with our analysis, affirmed our decision, and remanded the case for a new trial. *Id.* at 492.

Relying heavily on *Standifur*, the Supreme Court re-affirmed *Standifur*'s basic decisional framework, explaining that *Standifur*'s "final inquiry" mandates "that the trial judge parse the entire declaration to determine which portions of it are directly contrary to the declarant's penal interest, and which collateral portions are so closely related as to be equally trustworthy." *Matusky,* 343 Md. at 481-82. Applying that standard, the Court concluded that "the trial court erroneously admitted [the fiancée's] testimony *in toto* rather than analyzing the declaration statement by statement to determine whether collateral portions of [the co-defendant's] account should be redacted." *Id.* at 485. Instead, the Court observed that "the trial court should have redacted those portions of [the co-defendant's]

36

declaration identifying [respondent] as the murderer and suggesting [respondent's] motive for the crime" because "[t]hese portions of the declaration did not directly incriminate" him and simply served "to shift blame from [the co-defendant] to [respondent]." *Id.* Accordingly, "[b]ecause the trial court failed to properly analyze [the co-defendant's] hearsay declaration," respondent's convictions had to be reversed. *Id.*

The Court also addressed the United States Supreme Court's decision in *Williamson*. Although noting that *Williamson* was merely persuasive insofar as it interpreted federal evidentiary procedure, the Court resolved to "adopt it as part of Maryland law, in accord with a number of other states" and quoted approvingly from Justice Scalia's concurrence. *Matusky*, 343 Md. at 489-90 & n.13. However, as the Court observed, acceptance of *Williamson* required tweaking the *Standifur* framework because the "central distinction between the *Williamson* approach and our approach in *Standifur* is that 'proximity' between the self-inculpatory and 'collateral' portions no longer guarantees admissibility." *Id.* at 491. Instead, in parsing through each constituent portion of the larger narrative, "[t]he test for admissibility to be applied to each statement within a declaration is whether a reasonable person in the declarant's circumstances would have believed the statement was adverse to his or her penal interest at the time it was made." *Id.* at 492. Collateral proximity, at least absent a showing that the collateral statement was also sufficiently self-inculpatory, would no longer suffice. *Id.*

### 4. *Parties' Contentions*

We now return to the present case. Appellant argues two grounds upon which the trial court misapplied the statement against penal interest hearsay exception under

Maryland Rule 5-804(b)(3) when it admitted the Blake Interview.

First, he contends that Mr. Blake's statements in the Blake Interview were inadmissible because there were insufficient corroborating circumstances to bolster the trustworthiness of the statement to merit application of the exception. Appellant argues on appeal that the corroborating evidence acknowledged by the court was insufficient to establish the Blake Interview's reliability. Further, he asserts that the inconsistency exhibited throughout the interview "eviscerated its trustworthiness" because the statements did not intelligibly connect Appellant's evolving role in the organization to a timeline lasting several months. Appellant asserts that Mr. Blake's testimony also was not truly inculpatory because it tended to "distance[] himself from the organization." He notes that "Mr. Blake gave confusing and inconsistent answers about the timing of [Appellant]'s involvement[;]" for example, by indicating that "[Appellant] had 'dropped out' of the drug organization" in the months just before the raid, but also that "[Appellant] was still involved when Mr. Woods took over because [Appellant] 'knows the people' and that Appellant would visit Salisbury to retrieve his money and transport drugs[.]"

Second, he stresses that the trial court should have required the State to parse and further excise the recorded testimony before the court admitted it into evidence. Relying on *Standifur* and *Matusky*, Appellant asserts the trial court was required to conduct an "against-interest analysis for each statement" "by considering its content and the circumstances surrounding its making[,]" before it could "admit statements that directly incriminate the declarant and 'involve substantial exposure to criminal liability.'" Appellant posits that Mr. Blake's statements that acknowledged his own involvement in

the conspiracy but indicated that Appellant had superior control were "blame shifting" and thus were not against Mr. Blake's penal interest.

The State counters that Appellant failed to preserve the second argument by not asking the court to parse the Blake Interview and by failing to identify the specific statements which the court should have redacted. The State emphasizes that the Blake Interview that was admitted at trial and played for the jurors was significantly redacted from the version that the pretrial motions court ruled was permissible. The State cites *Belton v. State*, 152 Md. App. 623, 634 (2003) for the proposition that an opponent of the evidence must, in addition to noting an objection, "request redaction to preserve his appellate claim[.]" The State posits that, rather than request redactions, defense counsel adopted the State's argument that the statements could not be parsed as the reason to exclude the entire statement.

Addressing the merits, the State, quoting from Justice Scalia's concurrence in *Williamson*, emphasizes that "a declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible merely because the declarant names another person or implicates a possible codefendant." The State urges that "Blake's description of his own role, which was against his criminal interest" was inherently intertwined with his statements about Appellant. In response to Appellant's assertion that the Blake Interview was not sufficiently reliable, the State points to the existence of ample corroborating evidence considered by the court and asserts that the statements in the Blake Interview were adequately clear and coherent to be admitted. Noting the deferential standard of review applied to the trial court's determination of reliability, the State claims

that "[n]one of the[] claimed inconsistences [in the Blake Interview] meet the heavy burden of establishing plain error in the circuit court's finding of trustworthiness."

Appellant replies that he was not "required to request specific redactions to Mr. Blake's declaration to preserve this issue" regarding the court's putative failure to parse the statements. Citing *Matusky*, he notes that counsel in that case "did not request specific redactions" to the relator-witness's testimony proffering a statement against penal interest. Instead, counsel raised a general objection and was granted a continuing objection by the court. On appeal in that case, Appellant stresses that "[t]he Supreme Court of Maryland did not discuss preservation but appeared to find the issue preserved and decided on the merits." Here, Appellant argues, defense counsel's general standing objections were sufficient to preserve his hearsay argument regarding "the court's incontrovertible requirement to parse" each of the statements contained in the Blake Interview.

### 5.  *Analysis*

As noted, Appellant assigns two primary contentions of error with respect to admission of the Blake Interview: (1) that Mr. Blake's statements are inadmissible because there were insufficient corroborating circumstances to bolster the trustworthiness of the statement to merit application of the exception; and (2) that the trial court should have parsed and redacted the recorded testimony before the court admitted it into evidence. We shall address each contention in turn.

It is well established that a "trial court's ultimate determination of whether particular evidence is hearsay or  whether  it  is admissible under  a hearsay exception  is owed no deference on appeal, but the factual findings underpinning this legal conclusion

40

necessitate a more deferential standard of review." *Gordon v. State*, 431 Md. 527, 538 (2013). Therefore, when "reviewing a trial court's ruling on whether evidence falls under an exception to the rule against hearsay," this Court "reviews for clear error the trial court's findings of fact, and reviews without deference the trial court's application of the law to its findings of fact." *Hailes v. State*, 442 Md. 488, 499 (2015).

### a. The State Satisfied Its Burden of Proving Trustworthiness

The State, as the proponent of the Blake Interview, had the burden of proving that "corroborating circumstances clearly indicate the trustworthiness of the statement." Md. Rule 5-804(b)(3). Because the "trial court's assessment of the declaration's reliability is a fact-intensive determination[,]" we will "not ordinarily reverse unless it is clearly erroneous." *State v. Matusky*, 343 Md. 467, 486 (1996). Considering the circumstances presented in the instant case, we conclude that the State presented sufficient corroborating circumstances to permit the admission of portions of the Blake Interview.

As explained, at the September 14, 2020 motions hearing, the State listed examples of other evidence that it claimed corroborated the statements in the Blake Interview. Additionally, although Mr. Blake's reference to a purported request by Appellant for Mr. Blake to retrieve something from the "Pemberton" apartment was excised from the recording played at trial, the State explained at the motions hearing that this circumstance supported Mr. Blake's explanation "throughout the interview . . . that the Pemberton residence was somewhere that the organization utilized to store controlled dangerous

41

substances."[17]

Appellant acknowledges that corroboration by reference to other evidence is a proper means of proving trustworthiness, but stresses that the court was nevertheless required to "analyze the entire declaration and surrounding circumstances to ensure trustworthiness." We agree with Appellant that this inquiry is especially critical when the statement is offered against a defendant as we "treat as 'inevitably suspect' a statement made to persons in authority and implicating a codefendant" because a "defendant implicating his confederate may do so to curry favor with the authorities, to achieve a plea bargain, to shift the blame by showing that another was more culpable, or simply to have another with whom to share the blame." *State v. Standifur*, 310 Md. 3, 13 (1987) (quoting *Cruz v. New York*, 481 U.S. 186, 190 (1987)).

We recognize that, at the time of the interview, Mr. Blake was a potential co-defendant with a variety of severe health problems and that he had trouble clearly communicating with the officers. As Appellant points out, the officers expressed frustration several times that Mr. Blake's narrative was incoherent, unresponsive, or contradictory at times. Appellant seizes on the internal inconsistencies in the Blake Interview, claiming that they "eviscerated" its trustworthiness since "[r]epeated changes in [the declarant's] story . . . would properly make any [court] suspicious of the statement's

---

[17] It was proper for the trial court to consider this portion of the Blake Interview in determining admissibility because the court, in deciding such preliminary questions under Maryland Rule 5-104(a) "may, in the interest of justice, decline to require strict application of the rules of evidence, except those relating to privilege and competency of witnesses." Md. Rule 5-104(a).

42

reliability." *Stewart v. State*, 151 Md. App. 425, 455 (2003).  We also agree that certain portions of Mr. Blake's narrative, considered in isolation, could be considered contradictory or confusing.  For example, Appellant points to separate portions of the interview in which Mr. Blake claimed that Appellant gave him a certain amount of heroin each week and then explained that he actually received heroin from, and gave profits to, another alleged associate of Appellant's.

We do not agree, however, that these purported inconsistencies "eviscerated" the trustworthiness of Mr. Blake's narrative statement in its entirety.  First, as the State contends, some of the contradictions that Appellant points to can just as easily be construed as efforts on the part of Mr. Blake to clarify earlier ambiguous statements.  In the above example, although Mr. Blake did state that Appellant "gave" him around 15 to 30 bags of heroin per week, his later statement could (perhaps more naturally) be read as clarifying that Appellant did not personally hand him the narcotics and instead acted through an associate.  Such clarifications are often the byproduct of effective police questioning.  Sgts. Banks and Bennett several times throughout the interview—in addition to asking clarifying follow-up questions—would summarize their interpretation of Mr. Blake's story and repeat it back to him so that he could confirm, which he did by nodding affirmatively.

Second, although some of the intrinsic circumstances of the interview—namely, Mr. Blake's status as a potential co-defendant, failing health, and difficulty in expressing a fully consistent narrative—weighed against a finding of trustworthiness, the State produced ample corroborating evidence at trial to overcome those deficiencies.  Certainly Mr. Blake's statements regarding his role, and the role of Mr. Woods and Appellant in the

enterprise, were corroborated by other evidence produced at trial. Moreover, it is clear, both from the content of the Blake Interview and from the external circumstances, that Mr. Blake had intimate knowledge of and involvement in the drug distribution enterprise at the heart of this case. Accordingly, we hold that the trial court's finding that there were sufficient corroborating circumstances establishing the trustworthiness of the Blake Interview was not clearly erroneous.

### b. *The Trial Court Failed to Parse the Interview*

Next, we turn to Appellant's contention that the trial court failed to sift through the Blake Interview to determine which statements were sufficiently self-inculpatory and to redact all other statements. At the threshold, we reject the State's contention, relying on *Belton v. State*, 152 Md. App. 623, 634 (2003), that Appellant did not preserve this issue for our review because Appellant failed to identify and request redaction of the precise statements that should have been excluded from the redacted Blake Interview.

In *Belton*, we considered the propriety of admitting the recorded statement of a shooting victim after the victim had recanted his prior identification of Belton as the shooter at trial. *Belton*, 152 Md. App. at 626-29. There, the victim was robbed at gunpoint and shot in the chest. *Id.* at 626. The next day, the victim identified Belton as the shooter, identified him from a photo array, and proceeded to give a recorded statement in which he again identified Belton and corroborated his prior identification from the photo array. *Id.* at 627. At trial, the victim recanted his identification of Belton, but the State played for the jury a recording of the victim's statement in which the victim detailed that Belton shot him after having sold him marijuana. *Id.* at 628-29.

Belton noted a timely appeal and we held that the victim's recorded statement was properly admitted at trial as a prior inconsistent statement pursuant to Maryland Rule 5-802.1(a)(3) and as a prior extrajudicial identification pursuant to Maryland Rule 5-802.1(c). *Belton*, 152 Md. App. at 631-34. Belton, for his part, contended that the trial court exceeded its discretion in admitting the entire recording because it "contained, in addition to the extrajudicial identification, a detailed description of the events of the alleged crime, the statements alleged to have been [made] to [the victim] by appellant, and the length of [the victim's] and appellant's acquaintanceship." *Id.* at 633. We considered this argument unpreserved for our review, reasoning that "after the circuit court overruled appellant's general objection to admission of the tape, appellant did not request a redaction or limitation of the portion of the tape to be played to the jury." *Id.* at 634. We held that "it is the obligation of the party seeking redaction to raise the issue to the judge." *Id.* (citing JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK 20 (3d. ed.1999)).

We do not question the soundness of the principle that it is generally the "obligation of the party seeking redaction to raise the issue to the judge." *Belton*, 152 Md. App. at 634. Yet, the present case is ultimately governed by *Matusky*, which makes abundantly clear "that the *trial judge* [must] parse the entire declaration to determine which portions of it are directly contrary to the declarant's penal interest, and which collateral portions are so closely related as to be equally trustworthy." *State v. Matusky,* 343 Md. 467, 483 (1996) (emphasis added). Indeed, the *Matusky* Court identified the trial court's error in admitting the fiancée's testimony "*in toto* rather than analyzing the declaration *statement by statement* to determine whether collateral portions of White's account should be redacted."

45

*Id.* at 485 (emphasis added). The Court explained that "the trial court should have redacted those portions of White's declaration identifying [respondent] as the murderer and suggesting [respondent's] motive for the crime" because "[t]hese portions of the declaration did not directly incriminate White" and simply served "to shift blame from White to [respondent]." *Id.* The Court stressed that it was the trial court's responsibility to "break down the narrative and determine the separate admissibility of each 'single declaration or remark.'" *Id.* at 492 (quoting *State v. Mason*, 460 S.E.2d 36, 45 (W. Va. 1995)).

Although Appellant never offered proposed redactions of the Blake Interview, he objected to the Blake Interview coming into evidence on multiple grounds at the motions hearing and again at trial. Appellant challenged the State's contention that Mr. Blake's statements were self-inculpatory and attacked the overall trustworthiness of the Blake Interview on the premise that it was so "ambiguous" and "confusing" as to not be probative. Accordingly, Appellant preserved his objection to the admissibility of each statement within the broader narrative. In proceeding to admit the Blake Interview or a portion of it, over Appellant's objection, the trial court was required, as both *Matusky* and *Standifur* instruct, to determine the admissibility of each statement by examining whether each was sufficiently self-inculpatory as to Mr. Blake. We are not unmindful of the burden that this framework places on trial courts and, when possible, we would certainly encourage trial courts to request the parties to identify the portions of any narrative that should be redacted. In the instant case, the record reveals that the court failed to conduct the required

examination because it agreed with the State's argument, relying on Justice Scalia's concurrence in *Williamson*, that the statements could not be parsed.

At the September 14, 2020 motions hearing, the trial court relied heavily on Justice Scalia's concurrence, noting that "as Scalia says, that's the net effect, right? Which is it comes in under the exception and you don't get to automatically carve it out just because it inculpates potentially someone else." Indeed, in its ruling, the court explained that, although it was not aware of any Maryland decisional law that was directly controlling, the court "would note that Justice Scalia's concurrence does seem to be on point."

While statements contained in an interview of an unavailable declarant that name a co-conspirator and describe the mechanics of a conspiracy can qualify as statements against penal interest when they sufficiently inculpate the declarant, that does not discharge the court's fundamental duty to parse all of the statements in the interview. Justice Scalia recognized this very point, explaining that "the relevant inquiry . . . must always be whether the particular remark at issue (and *not* the extended narrative) meets the standard set forth in the Rule." *Williamson*, 512 U.S. at 607 (Scalia, J., concurring). The trial court's ruling in this case admitting the entire Blake Interview—even with the redactions offered by the State—could only stand if all of the statements therein were truly self-inculpatory.

That simply is not the case. Some statements, especially those that describe the workings of the enterprise prior to Mr. Woods entering the picture, can be deemed equally inculpatory of both Mr. Blake and Appellant. For example, Mr. Blake said he sold heroin that he received from Appellant and would ordinarily receive around 15 bags of heroin at

any given drop-off. That statement, although perhaps portraying Appellant as the more senior player, was certainly equally inculpatory of Mr. Blake.

However, other statements—while still relating to the overall enterprise—could not be considered genuinely inculpatory of Mr. Blake because they merely served to shift blame for the present workings of the enterprise to Appellant. It is evident that the discussion of Appellant's role was a significant portion of the interview as he was mentioned approximately 88 times. Indeed, the officers consistently asked Mr. Blake for details about Appellant's involvement, asking such questions as "so what I'm asking is, Mont's still at the top." Along a similar vein, in response to a question from the officers as to "Who's in charge," Mr. Blake responded "[Mr. Woods] has the stuff. [Appellant] knows the people." No portion of either of those statements implicated or even mentioned Mr. Blake, and he was adamant throughout the interview that Mr. Woods took over his role and that he was effectively "demoted" from any role in the sales operations.

Accordingly, we cannot agree that, based on the logic of Justice Scalia's concurrence in *Williamson*, the entire Blake Interview (even with the redactions offered by the State) was admissible as a statement against penal interest. We hold that admission of the entire Blake Interview presented by the State into evidence under Maryland Rule 5-804(b)(3) was in error. On remand, should the State decide to re-prosecute this case, the trial court is required to parse through the overall narrative and redact those portions which are not genuinely self-inculpatory as to Mr. Blake. *Matusky,* 343 Md. at 481-82, 485, 492.

### c. *Harmless Error*

"[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court,

upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated." *Dorsey v. State*, 276 Md. 638, 659 (1976).

In this case, Appellant was ultimately convicted only on possession of CDS and conspiracy to possess CDS charges, whereas he was either acquitted by the court or found not guilty by the jury of the remaining 30 counts, including all of the Drug Kingpin charges. Nevertheless, the Blake Interview, if credited, provided evidence of Appellant's frequent overnight visits in the house at the heart of the drug enterprise and his close association and interactions with a convicted conspirator in the enterprise. Such evidence is probative of Appellant having possession of CDS and participating in a conspiracy to possess CDS, where possession is defined to mean exercising "actual or constructive dominion or control over a thing by one or more persons." Maryland Code (2002, 2021 Repl. Vol.), Criminal Law Article ("CR"), section 5-101(v).

We weigh the trial court's error in admitting the Blake Interview by the *Dorsey* standard: that an error is harmless only if "there is no reasonable possibility that the evidence complained of-whether erroneously admitted or excluded-may have contributed to the rendition of the guilty verdict." *Dorsey* 276 Md. at 659. To say the admission of the Blake Interview did not contribute to Appellant's verdict, would require us "to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record." *Dionas v. State*, 436 Md. 97, 117 (2013). That we cannot do.

Here, the primary source of evidence during the trial other than the Blake Interview was the physical evidence of the drugs confiscated during the raid, and the testimony of

the police officers to the investigation into the three suspects. According to their testimony, Appellant did not participate in any of the undercover drug buys conducted by the officers and the evidence seized at the house, although found in some areas near Appellant's belongings, were primarily located near Mr. Woods's belongings. The officers' observation of Appellant's frequent presence at the house is the strongest alternative evidence of his involvement in a conspiracy to possess CDS, but that evidence was countered by Appellant's claim that he visited the house to help his friend, Mr. Blake. We cannot say beyond a reasonable doubt that the Blake Interview did not influence the jury's conviction of Appellant as it suggested his continuing involvement with the narcotics seized during the raid. Accordingly, the error is not harmless and we must vacate Appellant's convictions and remand for a new trial.

## II.

## Imposition of Multiple Sentences

Appellant argues that the State "provided no evidence proving multiple agreements" to the possession of illegal drugs, therefore proving no more than a single conspiracy; and "[i]mposing multiple sentences on a defendant for a single conspiracy is an illegal sentence[.]" The State agrees and acknowledges that "only one sentence can be imposed for a single common law conspiracy no matter how many criminal acts the conspirators have agreed to commit."

Indeed, our Court has held that the "unit of prosecution" for conspiracy is "the agreement or combination, rather than each of its criminal objectives." *Savage v. State*, 212 Md. App. 1, 13 (2013) (quoting *Tracy v. State,* 319 Md. 452, 459 (1990). Therefore, under

Maryland law, a conspirator is usually subject to only one conspiracy prosecution, and only one sentence can be imposed, for a single criminal agreement, regardless of how many criminal acts the conspirators agreed to commit. *Mason v. State,* 302 Md. 434, 445 (1985). Accordingly, we hold that *if* the State re-prosecutes this matter, it may only pursue a single conspiracy charge against Appellant as it concedes that it failed to prove the existence of more than one conspiracy.

> **JUDGMENTS OF THE CIRCUIT COURT FOR WICOMICO COUNTY VACATED. CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY WICOMICO COUNTY.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0573s22cn.pdf